**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| NEW ENGLAND ELECTRICAL WORKERS BENEFIT FUND, Individually and on Behalf of All Others Similarly Situated, | |
| *Plaintiff,* | Civil Action Number _____ |
| v. | **CLASS ACTION COMPLAINT** |
| TAKEDA PHARMACEUTICAL COMPANY LIMITED; TAKEDA AMERICA HOLDINGS, INC.; TAKEDA PHARMACEUTICALS U.S.A., INC.; TAKEDA DEVELOPMENT CENTER AMERICAS, INC.; MYLAN INC.; MYLAN PHARMACEUTICALS INC.; ACTAVIS PLC; ACTAVIS, INC. F/K/A WATSON PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.; RANBAXY LABORATORIES LTD.; RANBAXY INC.; RANBAXY PHARMACEUTICALS INC.; TEVA PHARMACEUTICAL INDUSTRIES LTD.; and TEVA PHARMACEUTICALS USA, INC., | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

Plaintiff New England Electrical Workers Benefit Fund ("NEEWBF" or "Plaintiff"), for itself and all others similarly situated, files this Class Action Complaint against Defendants Takeda Pharmaceutical Company Limited, Takeda America Holdings, Inc., Takeda Pharmaceuticals U.S.A., Inc., and Takeda Development Center Americas, Inc. (collectively, "Takeda"), Mylan Inc. and Mylan Pharmaceuticals Inc. (collectively, "Mylan"), Actavis plc, Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc., and Watson Laboratories, Inc. (collectively, "Actavis"), Ranbaxy Laboratories Ltd., Ranbaxy Inc., and Ranbaxy Pharmaceuticals Inc.

(collectively, "Ranbaxy"), and Teva Pharmaceutical Industries Ltd. and Teva Pharmaceuticals USA, Inc. (collectively, "Teva"). Defendants Mylan, Actavis, Ranbaxy, and Teva are collectively the "Generic Defendants." Takeda and the Generic Defendants will collectively be referred to as the "Defendants." The following allegations are based upon the investigation of counsel and information and belief.

## I.    NATURE OF THE ACTION

1.        This is an antitrust class action seeking treble damages arising out of Defendants' scheme to unlawfully delay generic competition in the market for pioglitazone hydrochloride tablets. Plaintiff brings this class action for all end-payors in the United States and Puerto Rico who indirectly purchased, paid, and/or provided reimbursement for branded and/or generic Actos and/or Actoplus met products, other than for re-sale, since January 17, 2011 regarding Actos (the "Actos Class Period") and since February 25, 2011 regarding Actoplus met (the "Actoplus met Class Period"). The Actos Class Period and the Actoplus met Class Period will collectively be referred to as the "Class Period."

2.        Takeda sells pioglitazone hydrochloride tablets under the brand name Actos. Actos is an oral diabetes medicine that helps control blood sugar levels. It is primarily used by people with type 2 diabetes. It is, therefore, a chronic care medication with a relatively captive group of purchasers who depend on this drug.

3.        Recognizing the captive nature of this market, Takeda entered into anticompetitive agreements with Mylan and Teva to unlawfully delay generic competition in the market for the fixed dose combination product containing both pioglitazone hydrochloride and metformin (biguanide),), which Takeda sells under the brand name Actoplus met.

4.        On July 15, 1999, the U.S. Food and Drug Administration ("FDA") approved Takeda's New Drug Application ("NDA") for ctos to improve glycemic control in

adults with type 2 diabetes either as a monotherapy or as a combination therapy comprising two separate drugs—pioglitazone hydrochloride with sulfonylurea, metformin, or insulin. Actoplus met is prescribed in combination with Actos as a fixed dose coordinated medication to improve blood sugar control in adults with type 2 diabetes.

5.         Actos and Actoplus met collectively generated over $3 billion in annual sales for Takeda. Faced with the prospect of generic competition concerning Actos, which comprises more than half of Takeda's product sales in the U.S., Takeda devised a scheme to prevent or delay generic competition and maintain its market share of these products.

6.         Takeda improperly listed two patents in the FDA's publication, *Approved Drug Products With Therapeutic Equivalence Evaluations* (the "Orange Book"), for Actos. In so doing, Takeda asserted U.S. Patent No. 5,965,584 (the "'584 Patent" claims a drug product comprising pioglitazone hydrochloride and a biguanide. It also asserted U.S. Patent No. 6,329,404 (the "'404 Patent") claims a drug product comprising pioglitazone hydrochloride and an insulin secretion enhancer. These two patents claim the Actos drug product.

7.         Notably, however, those two patents do not claim the Actos drug product, because the Actos drug product contains neither biguanide nor an insulin secretion enhancer.

8.         In addition, Takeda listed the '584 Patent in the Orange Book as claiming the drug product Actoplus met, which contains both pioglitazone hydrochloride and a biguanide. It also listed the '404 Patent in the Orange Book as claiming the drug product Duetact, which contains both pioglitazone hydrochloride and an insulin secretion enhancer.

9.         These false listings in the Orange Book allowed the first Actos generic manufacturer that filed an Abbreviated New Drug Application ("ANDA" with a Paragraph IV

certification, 21 U.S.C. § 355(j)(2)(A)(vii)(IV), to obtain 180-day market exclusivity provided under the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984) ("Hatch-Waxman Act"). Market exclusivity prevents the FDA from approving any other generic Actos product to enter the market until 180 days after the first filer enters. Under the Hatch-Waxman Act, 180-day first filer market exclusivity creates an opportunity for a branded manufacturer, like Takeda, to impose a "bottleneck." By paying off the first Paragraph IV generic filer not to enter the market, the branded company essentially forecloses the opportunity for later filed generic companies to easily enter the market.

10.     U.S. Patent No. 4,687,777 (the "'777 Patent" governing the drug substance for Actos expired on January 17, 2011. As part of its scheme to prevent or delay generic competition, Takeda commenced litigation against each generic company (Mylan, Ranbaxy, and Actavis) seeking to enter the Actos market. Defendants Mylan, Ranbaxy, and Actavis were entitled to "shared" 180-day exclusivity for Actos.

11.     Knowing that these litigations were a "sham" because these generic companies could easily demonstrate the patents were invalid or unenforceable, Takeda elected to enter into "reverse payment agreements" with Actavis, Mylan, and Ranbaxy rather than lose the litigations and lose 90% of the Actos market to generic competition as usually occurs within six months of generic entry. Under the "reverse payment agreements," Takeda gave valuable consideration to Actavis, Mylan, and Ranbaxy to withdraw their challenges to the patents and delay market entry.

12.     The agreements with these three companies created a "bottleneck." The intended effect of Takeda's "Reverse Payment Agreements" delayed entry not only by Actavis, Mylan, and Ranbaxy, but also by all subsequent ANDA filers, thereby harming competition and

4

end-payors that were deprived of the opportunity to more timely purchase less expensive generic versions of these drugs.

13.     Takeda utilized the same Actos scheme with regard to Actoplus met by listing the '584 Patent in the Orange Book as a drug product patent claiming Actoplus met along with various other patents as applicable method-of-use patents. Takeda, thereafter, commenced suit against every generic ANDA filer that sought FDA approval to sell generic Actoplus met. The first Paragraph IV certification ANDA filer was Mylan.

14.     Rather than face generic competition once the Hatch-Waxman Act 30-month stay expired under 21 U.S.C. § 355(j)(5)(B)(iii), Takeda elected to enter into another "Reverse Payment Agreement" with Mylan. Under this "reverse payment agreement," Takeda gave valuable consideration to Mylan for it to withdraw its challenge to the patents and delay entry into the market.

15.     Mylan, in turn, agreed to delay entering the market until 2012. This created yet another "bottleneck," delaying generic entry and harming competition and consumers.

16.     To cinch the anticompetitive effects of these agreements, Takeda, Mylan, Ranbaxy, and Actavis took additional anticompetitive measures to ensure that later filers did not undo the intended effects of these unlawful agreements.

17.     Rather than file a Paragraph IV certification concerning the '584 Patent and '404 Patent regarding Actos, Teva cleverly filed a "Section viii Statement" (*see* 21 U.S.C. § 355(b)(2)(B) and 21 U.S.C. § 355(j)(2)(A)(viii)). This allowed Teva to claim it was not seeking FDA approval for a use covered by the patents that Takeda had listed in the Orange Book. By filing in this manner, Teva was not subject to Paragraph IV 180-day market exclusivity and could more rapidly enter the market than other generic companies.

18.         Nevertheless, Takeda commenced a lawsuit against Teva for infringement of the patents allegedly covering Actos and Actoplus met. Because Teva did not file a Paragraph IV certification, it was not impacted by the "bottleneck" and could, if successful in the litigation, have entered the market with generic Actos upon the expiration of the '777 Patent on January 17, 2011.

19.         Yet again, Takeda elected to enter into a "Reverse Payment Agreement," this time with Teva. Under this "Reverse Payment Agreement," Takeda gave valuable consideration to Teva for it to withdraw its challenge to the patents, take no further action with regard to the improper listing of the Actos '584 and '404 Patents, and delay entry into the market.

20.         Teva, in turn, agreed to delay entering the market with generic Actos until August 17, 2012, and to delay entering the market with generic Actoplus met until Mylan entered in 2012. This created yet another "bottleneck," delaying generic entry and harming competition and end-payors.

21.         Defendants Takeda, Actavis, Mylan, Ranbaxy and Teva's unlawful schemes were designed to and did: (i) delay the entry of less expensive generic versions of Actos in the United States; (ii) fix, raise, maintain, or stabilize the price of Actos and its generic equivalents; (iii) permit Takeda to maintain a monopoly in the United States for Actos and its generic equivalents; (iv) allocate 100% of the United States market for Actos and its generic equivalents to Takeda; (v) delay the entry of less expensive generic versions of Actoplus met in the United States; and (vi) fix, raise, maintain, or stabilize the price of Actoplus met and its generic equivalents.

22.         As a direct and proximate result, Plaintiff and members of the class were injured in their business or property.

## II.    JURISDICTION AND VENUE

23.    This Court also has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367.

24.    Venue is appropriate in this district under 28 U.S.C. §§ 1391(b), (c) because two of the Defendants' principal places of business is in this district, Defendants transact business within this district, and the interstate trade and commerce described herein is carried out, in substantial part, in this district.

## III.    PARTIES

### A.    Plaintiff

25.    Plaintiff New England Electrical Workers Benefits Fund ("NEEWBF") is an employee welfare benefit plan. NEEWBF has its principal place of business in Wallingford, Connecticut. During the Class Period, as defined below, NEEWBF purchased, paid and/or provided reimbursement for brand-name Actos and Actosplus met (other than for resale) and/or its generic equivalents (other than for resale) in California, Florida, Massachusetts, Maine, Missouri, Nebraska, New Hampshire, New Mexico, New York, North Carolina, South Carolina, Tennessee, Texas and Vermont.  NEEWBF paid more than it would have absent Defendants' unlawful agreement to prevent and delay generic entry.

### B.    Defendants

26.    Takeda Pharmaceutical Company Limited is a Japanese company with its principal place of business at 1-1, Doshomachi 4-chome, Chuo-ku, Osaka 540-8645.

27.    Takeda America Holdings, Inc. is a wholly-owned subsidiary of Defendant Takeda Pharmaceutical Company Limited and the United States parent corporation of

Defendants Takeda Pharmaceuticals U.S.A., Inc. and Takeda Development Center Americas, Inc. Defendant Takeda America Holdings, Inc. is a corporation organized under the laws of the State of New York with its principal place of business at 767 Third Avenue, New York, New York 10017.

28. Takeda Pharmaceuticals U.S.A., Inc., formerly known as Takeda Pharmaceuticals North America, Inc., is a corporation organized under the laws of Delaware with its principal place of business at One Takeda Parkway, Deerfield, Illinois 60015.

29. Takeda Development Center Americas, Inc., formerly known as Takeda Global Research & Development Center, Inc., is a corporation organized under the laws of Delaware with its principal place of business at One Takeda Parkway, Deerfield, Illinois 60015.

30. The foregoing Defendants will collectively be referred to as "Takeda."

31. Mylan Inc., formerly known as Mylan Laboratories Inc., is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business at 1000 Mylan Boulevard, Canonsburg, Pennsylvania 15317.

32. Mylan Pharmaceuticals Inc., a wholly-owned subsidiary of Defendant Mylan Inc., is a corporation organized under the laws of West Virginia with its principal place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia 26505.

33. The foregoing "Mylan" Defendants will together be referred to as "Mylan."

34. Actavis plc is incorporated under the laws of Ireland, with its principal executive offices located at 1 Grand Canal Square, Docklands, Dublin 2, Ireland and its administrative headquarters located at Morris Corporate Center III, 400 Interpace Parkway,

Parsippany, New Jersey 07054. Actavis plc is the ultimate parent company of Defendants Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc. and Watson Laboratories, Inc.

35. Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc. is a corporation organized under the laws of Nevada with its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054. Watson Pharmaceuticals, Inc. changed its name to Actavis, Inc. because of Watson Pharmaceuticals, Inc's acquisition of Swiss-based Actavis Group in or around October 2012. Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc. is a subsidiary of Actavis plc and the parent corporation of Defendant Watson Laboratories, Inc.

36. Watson Laboratories Inc. is a Nevada corporation, having its principal place of business at 311 Bonnie Circle, Corona, California 92880. Defendant Watson Laboratories Inc. is a wholly-owned subsidiary of Watson Pharmaceuticals, Inc. (now Actavis, Inc.).

37. The foregoing "Actavis" Defendants will together be referred to as "Actavis."

38. Ranbaxy Laboratories Ltd. is an international pharmaceutical company headquartered in Gurgaon, Haryana, India. Ranbaxy is a member of the Daiichi Sankyo Group, which is headquartered in Tokyo, Japan. Defendant Ranbaxy Laboratories Ltd.' principal place of business in the United States is at 600 College Road East, Suite 2100, Princeton, New Jersey 08540.

39. Ranbaxy Inc. is a wholly-owned subsidiary and the North American commercial arm of Defendant Ranbaxy Laboratories Ltd., and the United States parent corporation of Defendant Ranbaxy Pharmaceuticals Inc. Defendant Ranbaxy Inc. is a

corporation organized under the laws of Delaware with its principal place of business at 600 College Road East, Suite 2100, Princeton, New Jersey 08540.

40.     Ranbaxy Pharmaceuticals Inc. is a wholly-owned subsidiary of Defendant Ranbaxy Inc.  Defendant Ranbaxy Pharmaceuticals Inc. is a corporation organized under the laws of Delaware with its principal place of business at 600 College Road East, Suite 2100, Princeton, New Jersey 08540.

41.     The foregoing "Ranbaxy" Defendants will collectively be referred to as "Ranbaxy."

42.     Teva Pharmaceutical Industries Ltd., one of the largest pharmaceutical companies in the world, has its principal executive offices and corporate headquarters in Petah Tikva, Israel.

43.     Teva Pharmaceuticals USA, Inc. is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd.  Defendant Teva Pharmaceuticals USA, Inc. is a corporation organized under the laws of Delaware with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania 19454.

44.     The foregoing "Teva" Defendants will together be referred to as "Teva."

45.     All of Defendants' wrongful actions described are part of, and in furtherance of, the anticompetitive scheme and anticompetitive agreements (as further described below), and were authorized, ordered, and/or executed by Defendants' various officers, agents, employees, and/or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

## IV. CLASS ACTION ALLEGATIONS

46.　　　　　Plaintiff sues as two class actions, under Fed. R. Civ. P. 23(a) and (b)(3),

for itself and the following classes (collectively, the "End-Payor Classes" or "Classes"):

Actos Class:

> All persons or entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Actos and/or its AB-rated generic equivalents in any form, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, other than for resale, at any time during the period from January 17, 2011 through the present and continuing until the anticompetitive effects of Defendants' unlawful conduct cease (the "Actos Class Period").　For purposes of the Class definition, persons or entities "purchased" Actos if they paid or reimbursed some or all of the purchase price.

Actoplus met Class:

> All persons or entities in the United States and its territories who indirectly purchased, paid or provided reimbursement for some or all of the purchase price of Actoplus met and/or its AB-rated generic equivalents, in any form, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, other than for resale, at any time during the period February 25, 2011 through the present and continuing until the anticompetitive effects of Defendants' unlawful conduct cease (the "Actoplus met Class Period"). For purposes of the Class definition, persons or entities "purchased" Actoplus met if they paid or reimbursed some or all of the purchase price.

47.　　　　　For each of the Classes, the following persons or entities are excluded

from the proposed class:

> a.　　　Defendants and their respective subsidiaries and affiliates;
>
> b.　　　All federal or state governmental entities, excluding cities, towns, or municipalities with self-funded prescription drug plans;
>
> c.　　　All persons or entities who purchased Actos and/or Actoplus met or the AB-rated generic equivalent for purposes of resale or directly from a Defendant;

11

d.   Fully insured health care plans (*i.e.*, health care plans that purchased insurance from a third-party payer covering 100% of a plan's reimbursement obligations to its members);

e.   Insured individuals covered by plans imposing a flat dollar co-pay that was the same dollar amount for generic as for brand drug purchases;

f.   Any "brand loyalist" consumers or third-party payors who purchased Actos and/or Actoplus met, but did not purchase any AB-rated generic after such generics became available; and

g.   All judges presiding in this case and all counsel of record.

48.      Members of each of the End-Payor Classes are so numerous that joinder is impracticable.  On information and belief, each Class includes hundreds of thousands, if not millions, of consumers, and thousands of third-party payors.

49.      As to each of the Classes, Plaintiff's claims are typical of those of each of the Class members.  As to each Class, Plaintiff and Class members were damaged by the same wrongful conduct of Defendants, *i.e.*, as a direct and proximate result of Defendants' wrongful conduct, they paid artificially inflated prices for Actos and/or Actoplus met and were deprived of the benefits of earlier and robust competition from cheaper generic versions of those products.

50.      As to each of the Classes, Plaintiff will fairly and adequately protect and represent the interests of the Class.  As to each of the Classes, the interests of Plaintiff are coincident with, and not antagonistic to, the interests of the Class members.

51.      Plaintiff is represented by counsel with twenty two years of antitrust litigation experience, eighteen years of class action antitrust experience, and fourteen years that have been consistently devoted to the prosecution of multi-state indirect purchaser generic drug issues which mirror those alleged herein.

52.      As to each of the Classes, questions of law and fact common to the Class members predominate over questions that may affect only individual Class members, because

Defendants have acted on grounds applicable to the entire Class, making overcharge damages regarding the Class as a whole appropriate. Such applicable conduct is inherent in Defendants' wrongful conduct.

53. As to the Actos Class, questions of law and fact common to the Class include, but are not limited to:

    a.    whether Defendants conspired to willfully maintain and/or enhance Takeda's monopoly power over Actos and its generic equivalents;

    b.    whether Takeda improperly listed the '584 Patent and the '404 Patent in the Orange Book as purported drug product patents covering Actos;

    c.    whether Defendants conspired to suppress generic competition to Actos;

    d.    whether Takeda and Mylan, Teva, Ranbaxy, and/or Actavis entered into unlawful agreements in restraint of trade;

    e.    whether, under the agreements, Mylan, Teva, Ranbaxy, and/or Actavis agreed to delay their entry into the market with generic Actos;

    f.    whether, under the agreements, Takeda paid Mylan, Teva, Ranbaxy, and/or Actavis;

    g.    whether Takeda's payments to Mylan, Teva, Ranbaxy, and Actavis were for a purpose other than delayed entry of generic Actos;

    h.    whether Takeda's payments to Mylan, Teva, Ranbaxy, and Actavis were necessary to yield a pro-competitivecompetitive benefit that is cognizable and non-pretextual;

    i.    whether the agreements are unlawful under the rule of reason;

    j.    whether Takeda possessed market power or monopoly power over pioglitazone hydrochloride;

    k.    whether the law requires definition of a relevant market when direct proof of market power or monopoly power is available and, if so, the definition of the relevant market;

    l.    whether Defendants' above-described conduct has substantially affected interstate and intrastate commerce;

m. whether, and to what extent, Defendants' conduct caused antitrust injury (*i.e.*, overcharges) to Plaintiff and the Class members; and

n. the quantum of aggregate overcharge damages to Plaintiff and the Class members.

54. As to the Actoplus met Class, questions of law and fact common to the Class include, but are not limited to:

a. whether Takeda, Mylan, and/or Teva conspired to suppress generic competition to Actoplus met;

b. whether Takeda, Mylan, and/or Teva entered into unlawful agreements in restraint of trade;

c. whether, under the agreements, Mylan and/or Teva agreed to delay their entry into the market with generic Actoplus met;

d. whether, under the agreements, Takeda paid Mylan and/or Teva;

e. whether Takeda's payments to Mylan and/or Teva were for a purpose other than delayed entry of generic Actoplus met;

f. whether Takeda's payments to Mylan and/or Teva were necessary to yield a pro-competitivecompetitive benefit that is cognizable and non-pretextual;

g. whether the agreements are unlawful under the rule of reason;

h. whether Takeda possessed market power in the relevant market;

i. whether the law requires definition of a relevant market when direct proof of market power is available and, if so, the definition of the relevant market;

j. whether Defendants' above-described conduct has substantially affected interstate and intrastate commerce;

k. whether, and to what extent, Defendants' conduct caused antitrust injury (*i.e.*, overcharges) to Plaintiff and the Class members; and

l. the quantum of aggregate overcharge damages to Plaintiff and the Class members.

55. As to each Class, class action treatment is the superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of

similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action.

56.    As to each Class, Plaintiff knows of no special difficulty that could be encountered that would preclude its maintenance as a class action.

57.    As to each Class, certification of the Class is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual Class members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

58.    As to each Class, Defendants' wrongful actions apply to the Class members as a whole, for which Plaintiff seeks, *inter alia*, damages and equitable remedies.

59.    As to each Class, absent a class action, Defendants would retain the benefits of their wrongdoing despite their serious violations of the law and infliction of harm on Plaintiff and Class members.

## V.    REGULATORY FRAMEWORK

### A.    NDA Approval and the Hatch-Waxman Act

60.    Under the federal Food, Drug, and Cosmetics Act ("FDC Act"), 21 U.S.C. §§ 301-392, a manufacturer who creates a new, pioneer drug must obtain the approval of the FDA to sell the new drug by filing an NDA, which must include submission of specific data concerning the safety and efficacy of the drug, and any information on applicable patents.

15

61.     Upon FDA approval of a brand-name manufacturer's NDA, it is published in the Orange Book. The Orange Book lists any patents: (1) that the brand-name manufacturer claim the approved drug or its approved uses; and (2) for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1); 21 U.S.C. § 355(j)(7)(A)(iii).

62.     In 1984, Congress amended the FDC Act with the enactment of the Hatch-Waxman Act.

63.     The Hatch-Waxman Act simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file a lengthy and costly NDA in order to obtain FDA approval. The Act provides an expedited review process by which generic manufacturers may file an ANDA.

64.     The ANDA relies on the scientific findings of safety and efficacy included by the brand-name drug manufacturer in the original NDA. The ANDA filer, however, must scientifically demonstrate to the FDA that the generic drug it will market is just as safe and just as effective as the corresponding brand-name drug through demonstrations of bioequivalence. Demonstrating bioequivalence means that, within certain set parameters of variability, the generic product delivers the same amount of active ingredient into the patient's blood stream for the same amount of time as the corresponding brand drug. The range of acceptable variability afforded to generic drugs for demonstrating bioequivalence is the same lot-to-lot (*i.e.*, batch-to-batch) range of variability afforded to brand companies when manufacturing their own brand drug.

65.     ANDA filers that demonstrate bioequivalence seek to have their generic products deemed "AB-rated" to the corresponding brand-name drug, sometimes referred to as the

"reference listed drug." AB-rated generics are those that have been determined by the FDA to be therapeutically equivalent (*i.e.*, bioequivalent) and pharmaceutically equivalent to their brand-name counterparts. Pharmaceutical equivalence means the generic drug and branded reference listed drug have, among other things, the same active ingredient, same strength, same route of administration, and same dosage form. Generic drugs that do not fulfill all of these requirements cannot be deemed AB-rated to the targeted reference listed drug.

66.     FDA approval of an ANDA requires a generic manufacturer's ANDA to contain one of the following four certifications: (a) the brand-name drug has no patent associated with it (a "Paragraph I certification"); (b) the brand-name drug's patents have expired (a "Paragraph II certification"); (c) the brand-name drug's patents will expire before the generic enters the market (a "Paragraph III certification"); or (d) the patent for the brand-name drug is invalid or will not be infringed by the generic product (a "Paragraph IV certification"). 21 U.S.C. § 355(j)(2)(A)(vii).

67.     If a generic manufacturer files a Paragraph IV certification that the listed patent is invalid or will not be infringed, it must promptly give notice to both the NDA owner and the owner of the patent(s) at issue. The filing of an ANDA with a Paragraph IV certification gives rise to a cause of action for patent infringement. 35 U.S.C. § 271(e)(2)(A). If the patent owner initiates an infringement action against the ANDA filer within 45 days, then the FDA may not finally approve the ANDA until the earlier of either 30 months or the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. 21 U.S.C. § 355(j)(5)(B)(iii). If, however, the patent owner fails to initiate a patent infringement action within 45 days after receiving notice of the generic manufacturer's Paragraph IV certification, then the FDA may grant final approval to the generic manufacturer's ANDA upon

17

satisfying itself as to the safety and efficacy of the generic product. The timely filing of an infringement action provides the patent owner with the equivalent of a 30-month automatic preliminary injunction. Prompt disposition of such an action, as through a motion for summary judgment, may mean more rapid approval for a generic manufacturer subject to such a stay.

68.        To encourage generic manufacturers to challenge branded drug patents and/or to design around them, the Hatch-Waxman Act grants the first Paragraph IV certification ANDA filer a 180-day exclusivity period to market the generic version of the drug, during which time the FDA may not grant final approval to any other generic manufacturer's ANDA for the same brand-name drug. 21 U.S.C. § 355(j)(5)(B)(iv) and 21 U.S.C. § 355(j)(5)(D).

69.        Typically, AB-rated generic versions of brand-name drugs are priced significantly below the brand-name counterparts. Because of the price differentials, and other institutional features of the pharmaceutical market, AB-rated generic versions are rapidly and substantially substituted for their brand-name counterparts. When multiple generic manufacturers enter the market, prices for generic versions of a drug predictably decrease significantly because of competition among the generic manufacturers, and because the loss of sales volume by the brand-name drug to the corresponding generics is dramatic.

70.        An AB rating is significant to a generic manufacturer because, under the statutory regime enacted by Congress (*i.e.*, the Hatch-Waxman Act) and most state legislatures (*i.e.*, Drug Product Selection laws, or "DPS laws"), pharmacists may (and, in most states, must) substitute an AB-rated generic version of a drug for the brand-name drug without seeking or obtaining permission from the prescribing doctor. Both Congress and state legislatures have actively encouraged generic substitution because of their recognition that the economics of the pharmaceutical industry prevent generic manufacturers from simultaneously: (a) engaging in the

type of heavy promotion or "detailing" typically done by brand-name manufacturers; and (b) providing the enormous cost savings to purchasers and consumers generated by generic drugs.

71.     Generic competition enables end-payors to: (a) purchase generic versions of brand-name drugs at substantially lower prices; and/or (b) purchase the brand-name drug at reduced prices. However, until generic manufacturers enter the market with an AB-rated generic, there is no bioequivalent generic drug that competes with the brand-name drug and, therefore, the brand-name manufacturer can continue to charge supra-competitive prices profitably without losing all or a substantial portion of its brand-name sales. Consequently, brand-name drug manufacturers have a strong incentive to use various anticompetitive schemes, including the tactics alleged, to delay the introduction of AB-rated generic competition into the market.

### B.    AB-rated Generic Versions of Brand-Name Drugs are Significantly Less Expensive, and Take Significant Sales Directly from the Corresponding Brand-Name Versions

72.     Competition from lower-priced AB-rated generic drugs saves American consumers $8-10 billion a year. As set forth *infra*, however, these consumer savings mean lower profits for brand drug companies. It is well-established that when AB-rated generic entry occurs, the brand drug company suffers a rapid and steep decline in sales and profits on its reference listed drug.

73.     Since passage of the Hatch-Waxman Act, every state has adopted substitution laws that either require or permit pharmacies to substitute AB-rated generic equivalents for branded prescriptions (unless the prescribing physician has specifically ordered otherwise).

74.     The threat of AB-rated generic competition creates a powerful incentive for brand companies to protect their revenue streams. This incentive can prompt brand companies to create innovative new products or new versions of old products that offer no real

medical benefits to patients. It may also drive brand companies to seek to obstruct generic drug competition by engineering illegal anticompetitive schemes to delay or prevent lower cost generic equivalents from entering the market, including entering into illegal agreements, as here, intended to interfere with the normal brand-to-generic competition contemplated and encouraged by the Hatch-Waxman Act and various state laws.

75. Such tactics can be an effective, albeit anticompetitive, way to "game the regulatory structure" that governs the approval and sale of generic drugs, thereby frustrating the intention of federal and state law designed to promote and facilitate price competition in pharmaceutical markets.

### C. Requirements for Listing Patents in the Orange Book

76. Part of the regulatory structure created by the Hatch-Waxman Act involves a process for identifying and addressing patents that arguably apply to brand and generic drug products and can be reasonably asserted against potential infringers in patent litigation. This regulatory structure requires the holder of an NDA to submit information concerning certain patents to the FDA, which incorporates the information into the Orange Book. Patent information is organized in the Orange Book by being listed for one or more specific NDAs. When a company seeks to file an ANDA, it must submit certain patent certifications or statements, described more fully below, to each patent listed in the Orange Book for the NDA that is the reference listed drug for the ANDA.

77. Under the Hatch-Waxman Act, after the FDA approves an NDA the NDA holder must submit certain required information concerning "any patent which claims the drug for which the application was submitted or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not

20

licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1)(G).

78.      At the relevant time when Takeda listed the '584 Patent and '404 Patent in the Orange Book for ACTOS-1999 and 2003, respectively—the relevant statute provided that the NDA applicant must list "any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C.A. § 355(b)(1) (1999) & (2002).

79.      The then-applicable regulations provided that three types of patents were properly listable: "drug substance (ingredient) patents, drug product (formulation and composition) patents, and method of use patents." 21 C.F.R. § 314.53(b) (1999) & (2002). The regulations further provided that "[fl or patents that claim a drug substance or drug product, the [NDA] applicant shall submit information only on those patents that *claim a drug product that is the subject of a pending or approved application,* or that claim a drug substance that is a component of such a product." *Id.* (emphasis added). Furthermore, the NDA holder can properly list a patent regarding a drug product only "with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale *of the drug product." Id.* (emphasis added). To be properly listed as a drug product patent, the patent had to claim the drug product that was the subject of the NDA; the patent's drug product claim could not just claim *some* drug product—it had to claim the *relevant* drug product, *i.e.*, the drug product as to which the NDA applicant listed the patent.

80.     The NDA applicants were on their honor to properly list the "Type of patent, *i.e.*, drug, drug product, or method of use." 21 C.F.R. § 314.53(c)(2)(ii) (1999) & (2002). The FDA expressly refused to police the proper listing of patents, noting it "does not have the resources or the expertise to review patent information for its accuracy and relevance to an NDA," and that it "believes that the declaration requirements under § 314.53(c) (requiring the applicant to declare "that Patent No. covers the formulation, composition, and/or method of use of (name of drug product)"), as well as an applicant's potential liability if it submits an untrue statement of material fact, will help ensure that accurate patent information is submitted." *Abbreviated New Drug Application Regulations: Patent and Exclusivity Provisions,* 59 Fed. Reg. 50338, 50345 (Oct. 3, 1994).

81.     Important regulatory and competitive consequences flow from the distinction between those patents listed in the Orange Book as containing drug product claims, and those listed as containing method-of-use claims. If the patentee lists the patent as containing a drug product claim, an ANDA applicant that wishes to market its generic product before the patent expires must file a Paragraph IV Certification, certifying that the patent is invalid, unenforceable, or would not be infringed by the generic product. 21 U.S.C. § 355(j)(2)(A)(vii)(IV); 21 C.F.R. § 314.94(a)(12)(i)(A)(4). The patentee and/or NDA holder then has the opportunity to obtain an automatic 30-month stay on generic competition by filing a patent infringement lawsuit against the ANDA applicant. In addition, and of particular importance here, the FDA is prohibited from approving a subsequent applicant's ANDA until 180 days after the first-filer has entered the market. 21 U.S.C. § 355(j)(5)(B)(iv). As discussed below, this "180-day exclusivity" creates an opportunity for the patentee to craft a "bottleneck" to delay *all* generic competition by paying the first-filer to delay its entry into the market.

82.    By contrast, if the patentee lists the patent on the basis of method-of-use claims, in certain circumstances an ANDA applicant can submit a "Section viii Statement." 21 U.S.C. § 355(j)(2)(A)(viii); 21 C.F.R. § 314.94(a)(12)(iii). In a Section viii Statement, the ANDA applicant states it is not seeking approval for the particular use covered by the method-of-use patent. Then the patentee or NDA holder *cannot* obtain an automatic 30-month stay on generic competition by suing the ANDA applicant for patent infringement. Further, the FDA can approve an ANDA that contains only a Section viii Statement *without regard* to whether any other ANDA applicant is otherwise entitled to a 180-day exclusivity period.

83.    Listing a patent as containing a drug product claim gives the patentee two key competitive advantages—an automatic 30-month stay on generic competition, and an ability to create a bottleneck delaying all generic competition by paying the first generic filer to delay entry into the market.

### D.    Paragraph IV Certifications

84.    Where the NDA holder has listed any patent claiming a drug substance or drug

product in the Orange Book, an ANDA applicant must certify that the generic drug will not infringe the patents listed in the Orange Book. Under the Hatch-Waxman Act, a generic manufacturer's ANDA must contain one of four certifications:

  i.    that no patent for the brand drug has been filed with the FDA (a "Paragraph I certification");

  ii.    that the patent for the brand drug has expired (a "Paragraph II certification");

  iii.    that the patent for the brand drug will expire on a particular date and the manufacturer does not seek to market its generic product before that date (a "Paragraph III certification"); or

iv.    that the patent for the brand drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").

85.        If a generic manufacturer files a Paragraph IV Certification, a brand manufacturer can delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement. If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the Paragraph IV certification ("Paragraph IV Litigation"), the FDA will not grant final approval to the ANDA until the earlier of (a) the passage of 30 months, or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. Until one of those conditions occurs, the FDA may grant "tentative approval," but cannot authorize the generic manufacturer to market its product. FDA may grant an ANDA tentative approval when it determines that the ANDA would otherwise be ready for final approval but for the 30-month stay.

86.        As an incentive to spur manufacturers to seek approval of generic alternatives to branded drugs, the first generic manufacturer to file an ANDA containing a Paragraph IV Certification typically receives a period of protection from competition from other generic versions of the drug. For Paragraph IV Certifications made before December 8, 2003, the first generic applicants received 180 days of market exclusivity, which could not be forfeited and was triggered only by commercial marketing of the generic product. For Paragraph IV Certifications made after December 8, 2003, the first generic applicant receives 180 days of market exclusivity (unless some forfeiture event, like that discussed below, occurs). This means the first approved generic is the only available generic for at least six months.

87.        Brand manufacturers can "game the system" by listing patents in the Orange Book (even if such patents are not eligible for listing) and suing any generic competitor filing an ANDA with a Paragraph IV Certification (even if the competitor's product does not

infringe the listed patents) to delay final FDA approval of an ANDA for up to 30 months. That brand manufacturers often sue generics under Hatch-Waxman simply to delay generic competition—as opposed to enforcing a valid patent that is actually infringed by the generic—is demonstrated by the fact that generic firms have prevailed in Paragraph IV Litigation in cases involving 73% of the drug products studied—either by obtaining a judgment of invalidity or non-infringement or by the patent holder's voluntary dismissal of the suit.

88.     For Paragraph IV Certifications made before December 8, 2003, the first generic applicant could help a brand manufacturer "game the system" by delaying not only its own market entry, but also the market entry of all other generic manufacturers. The first generic applicant, by agreeing not begin marketing its generic drug, thereby could delay the start of the 180-day period of generic market exclusivity, a tactic called exclusivity "parking." This tactic created a "bottleneck" because later generic applicants could not enter the market until the first generic applicant's 180-day exclusivity had elapsed or was forfeited.

89.     On December 8, 2003, Congress enacted the Medicare Prescription Drug Improvement and Modernization Act of 2003 ("MMA") in order to make it more difficult for brand and generic manufacturers to conspire to delay the start of the first-filer's 180-day period of generic market exclusivity. The MMA outlines several conditions under which an ANDA applicant forfeits its eligibility for 180-day exclusivity, making way for other ANDA filers to launch their generic products. For example, forfeiture occurs if the first ANDA applicant fails to obtain tentative approval within 30 months from filing, unless the failure is caused by a change in, or review of, the approval requirements.

90.     Under the "failure to market" provision, a first ANDA applicant forfeits 180-day exclusivity if it fails to market its generic drug by the later of: (a) the earlier of the date

that is (i) 75 days after receiving final FDA approval; or (ii) 30 months after the date it submitted its ANDA; or (b) the date that is 75 days after the date as of which, as to each of the patents qualifying the first applicant for exclusivity *(i.e.,* as to each patent for which the first applicant submitted a Paragraph IV Certification), at least one of the following has occurred: (i) a final decision of invalidity or non-infringement; (ii) a settlement order entering final judgment including a finding the patent is invalid or not infringed; or (iii) the NDA holder delists the patent from the FDA Orange Book.

91.     Brand manufacturers and first-filing generics can structure their settlements in order to intentionally skirt the failure-to-market provisions and keep the 180-day exclusivity bottleneck in place by, for example, settling their litigation before a final judgment of invalidity or non-infringement can be entered regarding each of the patents for which the first applicant submitted a Paragraph IV Certification, or seeking a consent judgment that does not include a finding that all of the patents for which the first applicant submitted a Paragraph IV Certification were invalid or not infringed. When that happens, to trigger forfeiture and gain access to the market, subsequent ANDA applicants are forced to obtain a judgment that all patents for which the first filing generic manufacturer filed Paragraph IV Certifications are invalid or not infringed. This may require the subsequent ANDA applicant to initiate a declaratory judgment action concerning patents that the brand manufacturer did not assert against it in a Paragraph IV Litigation.

### E.     The Benefits of Generic Drugs

92.     Generic versions of brand name drugs contain the same active ingredient, and are determined by the FDA to be just as safe and effective as their brand name counterparts. The only material difference between generic and brand name drugs is their price: generics are

usually at least 25% less expensive than their brand name counterparts when there is a single generic competitor. The discount typically increases to 50% to 80% (or more) when there are multiple generic competitors on the market for a given brand. The launch of a generic drug thus usually brings huge cost savings for all drug purchasers. The Federal Trade Commission ("FTC") estimates that about one year after market entry, the generic version takes over 90% of the brand's unit sales at 15% of the price of the brand name product. As a result, competition from generic drugs is viewed by brand name drug companies, such as Takeda, as a grave threat to their bottom lines.

93.     Due to the price differentials between brand and generic drugs, and other institutional features of the pharmaceutical industry, pharmacists liberally and substantially substitute the generic version when presented with a prescription for the brand-name counterpart. Since passage of the Hatch-Waxman Act, every state has adopted substitution laws that either require or permit pharmacies to substitute generic equivalents for branded prescriptions (unless the prescribing physician has specifically ordered otherwise by writing "dispense as written" or similar language on the prescription).

94.     There is an incentive to choose the less expensive generic equivalent in every link  in the prescription drug chain. As a result of federal reimbursement rules and the industry pricing structure, pharmacies typically earn a higher markup on generics than on brands. Private health insurers similarly offer direct incentives to pharmacies to substitute cheaper generic products for more expensive branded ones. Health insurers are contractually obligated to pay for the bulk of their members' prescriptions, whether filled with branded or generic drugs, so they offer their members lower copays for generic drugs to encourage the use of generics.

95.     Generic competition enables all members of the proposed Class to (a) purchase generic versions of the drug at substantially lower prices; and/or (b) purchase the brand drug at a reduced price.

96.     Until a generic version of the brand drug enters the market, however, there is no bioequivalent generic drug to substitute for, and compete with, the brand drug, and, therefore, the brand manufacturer can continue to profitably charge supracompetitive prices. As a result, brand manufacturers, who are well aware of generics' rapid erosion of their brand sales, have a strong incentive to delay the introduction of generic competition into the market, including by using tactics such as the improper patent listing and Reverse Payment Agreements at issue here.

**F.     The Impact of Authorized Generics**

97.     The 180-day marketing exclusivity to which first-filer generics may be entitled

98.     does not prevent a brand manufacturer from marketing its own generic alternative to the brand drug during that 180-day period. Such an "authorized generic" is chemically identical to the brand drug, but is sold as a generic product through either the brand manufacturer's subsidiary (if it has one) or through a third-party generic manufacturer. Competition from an authorized generic during the 180-day exclusivity period substantially reduces the first-filer's revenue, and substantially reduces drug prices for consumers.

99.     In its recent study, *Authorized Generic Drugs: Short-term Effects and Long-Term Impact* (August 2011) (the "FTC Study"), the FTC found that authorized generics capture a significant portion of sales, reducing the first-filer generic's revenues by approximately half on average during the 180-day exclusivity period. The first-filing generic makes significantly

less money when it faces competition from an authorized generic because (1) the authorized generic takes a large share of unit sales away from the first filer; and (2) the presence of an additional generic in the market causes prices to decrease.

100.        Although first-filing generic manufacturers make significantly less money when they must compete with an authorized generic during the first 180 days, consumers and other drug purchasers such as Plaintiff and the End-Payor Classes benefit from the lower prices caused by competition between the authorized generic and the first-filing generic.

101.        Given the significant negative impact of an authorized generic on the first-filing generic's revenues, a brand manufacturer's agreement not to launch an authorized generic has tremendous value to the generic manufacturer. Brand manufacturers have used such agreements as a way to pay the first-filer to delay entering the market. Such non-competition agreements deprive consumers and other drug purchasers such as Plaintiff and the End-Payor Classes of the lower prices resulting from two forms of competition: (1) between the branded and the generic products; and (2) between the generic products.

## VI.    DEFENDANTS' ANTICOMPETITIVE CONDUCT

### A.    Takeda Improperly Lists the '584 Patent and '404 Patent.

102.        Takeda submitted NDA 21-073 on January 15, 1999, seeking the FDA's approval to manufacture, market and sell Actos containing the active ingredient pioglitazone hydrochloride. Six month later, on July 15, 1999, the FDA approved Takeda's NDA for the use of Actos to improve glycemic control in adults with type 2 diabetes either as monotherapy or in combination with a sulfonylurea, metformin, or insulin.

103.        Takeda, thereafter, submitted the '777 Patent, entitled "Thiazolidinedione Derivatives, Useful As Antidiabetic Agents," for listing in the Orange Book as a drug substance patent covering Actos. The '777 Patent claims the active ingredient for Actos, pioglitazone

hydrochloride, and was issued to inventors Kanji Meguro and Takeshi Fujita on August 18, 1987 and assigned to Takeda. The '777 Patent purports to claim the novel compound commonly known under the nonproprietary name "pioglitazone" and itspharmacologically acceptable salts. Actos and Actoplus met are both covered by the '777 Patent, which expired on January 17, 2011.

104. Takeda was well aware that Actos would be subject to generic competition upon the expiration of the '777 Patent and that it would lose approximately 90% of its market within the first six to nine months of generic entry. To extend its patent monopoly beyond January 17, 2011, Takeda listed ten additional patents in the Orange Book regarding Actos.

105. Takeda is the owner, by assignment, of the '584 Patent. The '584 Patent, entitled "Pharmaceutical Composition," purports to claim a pharmaceutical composition comprising pioglitazone or salts thereof in combination with a biguanide (e.g., metformin) and methods for treating diabetes which comprise administering a therapeutically effective amount of pioglitazone or salts thereof in combination with a biguanide (e.g., metformin).

106. Actoplus met is the purported commercial embodiment of the '584 Patent, which expires on June 19, 2016. Takeda submitted the '584 Patent to the FDA for listing in the Orange Book as a drug product patent and a method-of-use patent regarding Actos.

107. Takeda is the owner, by assignment, of the '404 Patent. The '404 Patent, entitled "Pharmaceutical Composition," purports to claim a pharmaceutical composition comprising pioglitazone or salts thereof *in combination with* an insulin secretion enhancer (e.g., a sulfonylurea, such as glimepiride) and methods for treating diabetes which comprise administering a therapeutically effective amount of pioglitazone or salts thereof in combination with an insulin secretion enhancer.

108.        Duetact is the purported commercial embodiment of the '404 Patent, which expires on June 19, 2016. Takeda submitted the '404 Patent to the FDA for listing in the Orange Book as a drug product patent and a method-of-use patent regarding Actos.

109.        Takeda also submitted eight more patents to the FDA for listing in the Orange Book. These patents were "Method-of-Use Patents" which claimed various methods of using Actos in combination with other drug products.

110.        Under both the Hatch-Waxman Act and the FDA's implementing regulations, the drug product claims for the '584 Patent and the '404 Patent do not form a permissible basis for listing those patents in the Orange Book.

### 1.        The Patents Do Not Claim Actos As A Matter of Law

111.        The drug product claims in the referenced patents could properly be listed in the Orange Book for the Actos NDA only if those patents, in fact, claimed the Actos drug product. They do not. The active ingredient in Actos is pioglitazone hydrochloride alone.  The drug product claims in the '584 Patent and the '404 Patent claim drug products that contain both pioglitazone *and* certain additional active ingredients—biguanide or an insulin secretion enhancer, respectively. Thus, neither claim a drug product that contains pioglitazone as the sole active ingredient.

### 2.        The Patents Claimed Only Drugs Other Than Actos

112.        On or about November 5, 1999, Takeda directed the FDA to list the '584 Patent in the Orange Book as claiming both the "drug product" Actos and its "method of use." On or about January 3, 2003, Takeda directed the FDA to list the '404 Patent in the Orange Book as claiming both the "Drug Product" Actos and its "Method of Use." Takeda could not reasonably assert the drug product claims of the '584 Patent or the '404 Patent against generic

manufacturers seeking to market Actos because those patents claimed only drugs *other* than the Actos drug product.

113.        As a result of this filing, generic companies seeking to enter the market were essentially required to file Paragraph IV Certifications. While Takeda originally asserted those drug product claims against generic manufacturers of Actos, Takeda, notably, withdrew those infringement claims before a court could rule on them.

114.        Teva asserted in a Citizen Petition filing that Takeda had improperly caused the FDA to list the '584 Patent and '404 Patent in the Orange Book as drug product patents for Actos. In response, Takeda "confirm[ed] for FDA the listing of [the '584 Patent and '404 Patent] under the terms described in Takeda's original patent submissions" and acknowledged it "characterized them for FDA in the appropriate patent declarations as containing both 'Drug product' and 'Method of use' claims," and that "[s]ince the original submission of these patents to FDA, Takeda has continued to certify to the applicability of the patents to Actos under the original declarations...."

115.        Ruling on the Citizens Petition, the FDA reiterated Takeda's original demands for patent listing had "stated that the patents claimed both the drug product and a method of use." In so doing, FDA concluded that "[i]n keeping with our practice of relying solely on the NDA sponsor's patent declaration describing relevant patent claims in Orange Book-listed patents, FDA will rely on Takeda's patent declarations submitted to FDA."

116.        FDA noted Takeda's January 22, 2010 Comment to the Citizens Petition had "reconfirm[ed]" the original listing and emphasized "FDA's role in listing patents and patent information in the Orange Book is [purely] ministerial." By performing this function "FDA relies on the NDA sponsors to provide an accurate patent submission."

117. FDA, therefore, concluded that, because Takeda had submitted the '584 Patent and '404 Patent as claiming the ACTOS drug product, all ANDA filers seeking approval to market generic Actos before the expiration of those patents had to submit Paragraph IV Certifications, rather than Section viii Statements.

118. Had Takeda not improperly listed the '584 Patent and '404 Patent in the Orange Book, and its subsequent reaffirmation of those listings in its January 22, 2010 Comment to the Citizens Petition, no generic company filing an ANDA application would have been required to submit a Paragraph IV Certification for Actos regarding the '584 Patent and '404 Patent. In other words, generic companies would and could have pursued the same route as Teva (Section viii statement alone) and would have entered the market much earlier.

119. Accordingly, absent Takeda's improper listing of the '584 Patent and '404 Patent in the Orange Book as claiming the Actos drug product, massive generic entry, by 10 or more manufacturers of generic Actos, would have occurred on or about January 17, 2011. This would have resulted in millions of dollars in savings to US consumers.

   **B.    Takeda Delays the Entry of Generic ACTOS.**

   **1.    Takeda Files Paragraph IV Litigation Against Mylan, Ranbaxy, and Actavis**

120. On July 15, 2003, three generic manufacturers, Alphapharm (later acquired by Mylan), Ranbaxy, and Actavis, each filed ANDA applications with a Paragraph IV certification seeking FDA approval to manufacture, market and sell generic Actos. Because these companies all filed on the same day the FDA determined they were each entitled to the 180-day market exclusivity period for Actos under the Hatch-Waxman Act.

121. On or about September 8, 2003, Mylan notified Takeda it had filed ANDA No. 76-801 seeking to market a generic version of Actos. The notification included a

Paragraph IV Certification as to the '584 and '404 Patents, and Section viii Statements as to the Method-of-Use Patents.

122.     Actavis notified Takeda on September 9, 2003 that it had filed ANDA 76-798 seeking to market a generic version of Actos. The Actavis notification contained a Paragraph IV Certification as to the '584 and '404 Patents, and Section viii Statements as to the Method-of-Use Patents.

123.     Likewise, Ranbaxy notified Takeda on September 18, 2003 that it had filed ANDA 76-800 seeking to market a generic version of Actos. Ranbaxy's notification contained a Paragraph IV Certification as to the '584 and '404 Patents, and Section viii

124.     Statements as to the Method-of-Use Patents.

125.     In response to these notifications, Takeda timely filed three separate patent infringement suits in the United States District Court for the Southern District of New York on October 17, 2003. Under the Hatch-Waxman Act, these filings created a 30 month stay which prevented the FDA from approving Actavis, Mylan, and Ranbaxy's ANDA applications until the 30 months expired or a final ruling was entered determining the patents were invalid or unenforceable or, in the alternative, that the generics could manufacture Actos without infringing a patent.

126.      In each case, Takeda alleged that Defendants generic ANDA applications and the Actos product outlined therein infringed the drug product claims of '584 and '404 Patents and also induced infringement of the method-of-use claims of the '584 and '404 Patents and certain of the Method-of-Use Patents.

127.     In response to these allegations, Mylan, Actavis, and Ranbaxy utilized the discovery process in each case to obtain evidence in support of their defenses. The evidence that

they received was so substantial that Takeda, shortly before trial, withdrew all of the drug product infringement claims under both the '584 and '404 Patents.

128.     As the January, 2011 expiration of the '777 Patent approached, the district court set a trial date for April, 2010.  Realizing that it could no longer seek to prevent or delay these well armed generic companies who were anxious to enter the market, Takeda elected to unlawfully extend its Actos monopoly by entering into "Reverse Payment Agreements" with Mylan, Actavis, and Ranbaxy. Takeda gave these generic companies valuable consideration to withdraw their defenses to the patents and delay introducing their generic Actos products.  For example, Takeda agreed that it would not launch or licensee an authorized generic version of Actos during Mylan's, Ranbaxy's and Actavis's first 180 days of marketing. Takeda further agreed under an acceleration clause that if any other generic Actos entered the market before August 17, 2012, Mylan, Ranbaxy, and Actavis could immediately enter the market.   The absence of an authorized generic product meant that a number of Actos generic sales would go to Mylan, Ranbaxy, or Actavis during this 180 period which culminated in a substantial amount of monies going into each of their corporate coffers.  This was the equivalent of Takeda handing Mylan, Ranbaxy, and Actavis substantial monies directly.

129.     Under the "Reverse Payment Agreements," Takeda dismissed its litigations against Mylan, Actavis, and Ranbaxy.  In turn, Mylan, Actavis, and Ranbaxy dropped their challenges to the Takeda patents and essentially agreed to delay launching their generic Actos products until August 17, 2012.

130.     At least seven other generic competitors notified Takeda they had filed ANDAs seeking to market a generic version of Actos. Many of these generic competitors sent notifications  that included a Paragraph IV Certification regarding the '584 and '404 Patents.

131.        Yet again Takeda filed, without regards to the merits, multiple patent infringement suits alleging these manufacturers' generic Actos products would directly infringe the '584 and '404 Patents, and indirectly infringe the Method-of-Use Patents.

132.        Takeda's "Reverse Payment Agreements" with Mylan, Ranbaxy, and Actavis, caused subsequent ANDA filers to agree to [ ] patent cases brought by Takeda. All of these potential competitors agreed to delay entry into the market until 180 days after Mylan, Ranbaxy, and Actavis entered the market. Absent the "bottleneck" created by these agreements, later ANDA filers would have more timely entered the market.

C.        **Actoplus met Generic Delay.**

1.        **Takeda Files Paragraph IV Litigation Against Mylan.**

133.        Takeda submitted NDA 21-842 on October 27, 2004, seeking FDA approval to manufacture, market and sell a fixed single dose combination of pioglitazone hydrochloride and metformin hydrochloride. Takeda listed the '584 Patent in the Orange Book as a drug product patent for Actoplus met, and listed several additional patents as applicable method-of-use patents.  In a ministerial manner, the FDA approved Takeda's NDA for Actoplus met on August 29, 2005.

134.        Actoplus met is one of Takeda's most profitable drugs generating annual sales of $413 million in 2012.

135.        Mylan notified Takeda on June 23, 2008, that it had filed ANDA No. 90-406, seeking to manufacture, market and sell a generic version of Actoplus met. Mylan's notification included a Paragraph IV Certification regarding the '584 Patent and certain method-of-use patents. Mylan was the first ANDA filer with a Paragraph IV Certification to market generic Actoplus met.

36

136.     Takeda, thereafter, sued Mylan in the United States District Court for the Southern District of New York on August 5, 2008 alleging Mylan's ANDA for generic Actoplus met directly infringed and would induce infringement of the '584 Patent and the method-of-use patents.

137.     Under the Hatch-Waxman Act's 30 month stay provision, Takeda obtained the automatic exclusion of Mylan from the market for 30 months and the ability to create a 180-day exclusivity bottleneck.

138.     Rather than litigate this case to its full conclusion, Takeda induced Mylan to withdraw its defenses and resolve the matter.

### 2.     The Takeda/Mylan Actoplus met Reverse Payment Agreement.

139.     On March 15, 2010, Takeda entered into a "Reverse Payment Agreement" Mylan in connection with Actoplus met and the Actoplus met litigation. Under the "Reverse Payment Agreement," Mylan withdrew its challenge to the Takeda patents and agreed to stay out of the market with generic Actoplus met until August 17, 2012, or as late as December 14, 2012.

140.     Takeda, in turn, agreed to give Mylan valuable consideration.  Takeda agreed not to launch or license an authorized generic version of Actos met during MyIan's first 180 days of market exclusivity.  The absence of an authorized generic product meant that a number of Actoplus met generic sales would go to Mylan during this 180 period which culminated in a substantial amount of monies being transferred into Mylan's corporate coffers. This agreement was the equivalent of Takeda handing Mylan substantial monies directly.

141.     Takeda further agreed under an acceleration clause that if any other generic Actos met entered the market Mylan could immediately begin selling its version of Actoplus met.

142.     The Reverse Payment Agreement caused Mylan to stay out of the market longer than it otherwise would have done.

143.     By entering a consent judgment that did not include the requisite findings that would have resulted in a forfeiture of Mylan's 180-day exclusivity, Takeda and Mylan created substantial barriers to entry by later-filing generic manufacturers.

144.     At least four other generic competitors notified Takeda they had filed ANDAs seeking to market a generic version of Actoplus met. Each of these notifications included a Paragraph IV Certification regarding the '584 Patent and the method-of-use patents.

145.     Takeda filed multiple patent infringement suits alleging these generic Actoplus met products would directly infringe the '584 Patent and indirectly infringe the method-of-use patents. Takeda filed these patent infringement cases, without regard to the merits, against the potential generic competitor in order to obtain the Hatch-Waxman 30 month automatic exclusion.

146.     In light of the bottleneck created by Takeda's "Reverse Payment Agreement" with Mylan, these potential competitors agreed to withdraw their claims against Takeda and to delay entry into the market until 180 days after Mylan entered. Absent the bottleneck created by Takeda's "Reverse Payment Agreement," these generics would have entered the market much sooner.

147.     Teva filed ANDA No. 77-210 on July 14, 2004, seeking to manufacture, market and sell generic versions of Actos.

148.     Teva did an "end run" around Paragraph IV Certifications regarding the '584 Patent and the '404 Patent and the Method-of-Use Patents by filing only Section viii Statements. The Statements asserted that Teva's label for its generic Actos would "carve out"

information regarding methods of using Actos in combination with a biguanide or an insulin secretion enhancer (the methods of use claimed by the '584 Patent and the '404 Patent, respectively) or other uses covered by the Method-of-Use Patents.

149.    Teva's filing would allow the FDA to approve Teva's ANDA without regard to whether any other ANDA applicant was otherwise entitled to a 180-day exclusivity period regarding Actos. Thus, Teva could "leap frog" over Mylan, Ranbaxy, and Actavis and launch a generic version of Actos once the '777 Patent expired in January, 2011.

150.    Teva notified Takeda, on April 14, 2009, that Teva filed ANDA No. 91-155, seeking to manufacture, market and sell generic versions of Actop1us met.

151.    On May 18, 2009, Takeda sued Teva, without regard for the merits, in the United States District Court for the Southern District of New York alleging that Teva directly infringed, intentionally induced infringement, and/or contributed to the infringement of the patents. Takeda alleged that Teva's ANDA for Actos intentionally induced infringement of the '584 Patent, the '404 Patent, and the Method-of-Use Patents.  A June, 2010 trial date was set by the court.

152.    On March 15, 2010, the FDA, during the pendency of the Teva lawsuit, ruled on a Citizen Petition concluding that, in its purely ministerial role, the FDA had no ability to alter Takeda's listing of the '584 Patent and the '404 Patent in the Orange Book as purported drug product patents covering Actos. Thus, the FDA concluded it could not approve any ANDA that did not include a Paragraph IV Certification as to the '584 Patent and the '404 Patent. Teva's ANDA for Actos did not contain such a certification.

153.    Teva, thereafter, in response to this development filed a motion to amend its answer and to add a counterclaim that Takeda had improperly caused the '584 and '404 Patents

to be listed as drug product patents in the Orange Book. If Teva was successfully on this counterclaim, Teva would not have been subject to the 180-day bottleneck that Takeda and Mylan, Ranbaxy, and Actavis had constructed with their "Reverse Payment Agreement" and entered the market with generic Actos as early as January 17, 2011.

154.    Takeda and Teva began settlement negotiations soon after Teva's motion to amend. On December 22, 2010, Takeda and Teva entered into a "Reverse Payment Agreement" in which Teva agreed to drop its challenges to Takeda's patents regarding both Actos and Actop1us met as well as its counterclaim.  It further agreed to stay out of the market with generic Actos until August 17, 2012, and stay out of the market with generic Actoplus met until the date on which Mylan entered.

155.    Takeda agreed to give Teva valuable consideration if it stayed out of the market such as a license to market generic Actos under Takeda's NDA beginning on August 17, 2012. Takeda also agreed that it would not launch or license an authorized generic version of Actos during Teva's first 180 days of marketing. This agreement was the equivalent of Takeda handing Teva substantial monies directly. Takeda further agreed that if any other Actos generic entered the market during the exclusion period, Teva would be allowed to immediately enter the market.

156.    Takeda further agreed to grant Teva a license to market generic Actoplus met under Takeda's NDA beginning on the date that Mylan first entered the market with its generic Actoplus met. And it also agreed that it would not launch or license an authorized generic version of Actoplus met during Teva's first 180 days of marketing. This agreement was the equivalent of Takeda handing Teva substantial monies directly concerning Actoplus met. Its also agreed that if any other generic Actoplus met entered the market before the time specified for

Teva to enter, Teva could timely enter that market. The "Reverse Payment Agreements" caused Teva to stay out of the market longer than it otherwise would have done.

## VI.  ANTICOMPETITIVE EFFECT

157.     Defendants' conduct, in whole or in part, have enabled Defendants to: (i) prevent or delay the entry of less expensive generic versions of Actos and Actoplus met in the United States; and (ii) fix, raise, maintain, or stabilize the price of Actos and Actoplus met products. But for Defendants' illegal conduct, generic manufacturers would have entered the market unimpeded and competed on the merits against Actos and Actoplus met. Generic competitors for Actos would have competed as early as January 17, 2011. Generic competitors for Actoplus met would have competed as early as February 25, 2011. Defendants' conduct unlawfully delayed and diminished the savings that purchasers of Actos and Actoplus met and their generic equivalents would have garnered from unimpaired generic competition.

158.     Defendants' conduct, in whole or in part, harmed Plaintiff and the End-Payor Classes by depriving them of, *infra*: (i) a marketplace in which manufacturers and distributors of generic drugs make their decisions about challenging patents and entering markets free from the influence of unlawful payments; and (ii) the most cost efficient means of distribution. Contrary to the purpose of the Hatch-Waxman Act, the anticompetitive conduct enabled Defendants to, *inter alia:* (i) delay the entry of less expensive generic versions of Actos and Actoplus met in the United States; (ii) fix, raise, maintain, or stabilize the price of Actos and Actoplus met; and (iii) permit Takeda to maintain a monopoly in the United States market for Actos and its generic equivalents.

159.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated members of the Classes have sustained (and continue to sustain) substantial losses and damage to their business and property in the form of overcharges

they paid for Actos and Actoplus met and their generic equivalents, the exact amount of which will be proven at trial.

## VII. EFFECTS ON INTERSTATE AND INTRASTATE COMMERCE

160.     At all material times, Takeda manufactured, marketed, distributed, and sold substantial amounts of Actos and Actoplus met in a continuous and uninterrupted flow of commerce across state and national lines throughout the United States.

161.     At all material times, Defendants transmitted funds, and contracts, invoices and other forms of business communications and transactions, in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Actos and Actoplus met and their generic equivalents.

162.     In furtherance of their efforts to monopolize and restrain competition, Defendants employed the United States mails and interstate and international telephone lines, and means of interstate and international travel. Defendants' activities were within the flow of, and have substantially affected (and continue to substantially effect) interstate commerce.

163.     Defendants' anticompetitive conduct had substantial intrastate effects in that, *infra*, retailers within each state were foreclosed from offering cheaper generic Actos and Actoplus met to end-payors inside each respective state. The complete foreclosure of generic Actos and Actoplus met directly impacted and disrupted commerce for end-payors within each state by forcing them to buy the branded product at the higher price.

## VIII. MARKET POWER AND MARKET DEFINITION FOR ACTOS

164.     At all relevant times, Takeda had market power (*i.e.*, monopoly power) with respect to Actos and its generic equivalents because it had the power to maintain the price of Actos at supracompetitive levels without losing so many sales as to make the supracompetitive price unprofitable.  At all relevant times, a small, but significant, non-transitory price increase

42

above the competitive level for Actos by Takeda would not have caused a loss of sales sufficient to make the price increase unprofitable.

165.     At all relevant times, at competitive price levels Actos did not exhibit significant, positive cross-elasticity of demand regarding price with any product other than AB-rated generic versions of ACTOS. Other oral Type 2 diabetes medicines are not AB-rated to ACTOS, cannot be automatically substituted for Actos by pharmacists, do not exhibit substantial cross-price elasticity of demand regarding Actos, and thus, are not economic substitutes for, nor reasonably interchangeable with, Actos.

166.     ACTOS is part of the Type 2 diabetes drug class called thiazolidinediones. Thiazolidinediones, like a few other antidiabetic classes of drugs, are often referred to as "insulin sensitivity enhancers" due to their ability to decrease the body's resistance to insulin. Unique to  thiazolidinediones, however, is that they increase certain levels of proteins—those that are more sensitive to insulin—and thus are the primary means by which a patient's blood sugar levels may be lowered. Due to their differing effect within the body, thiazolidinediones are significantly unique in their efficacy, safety, and side effect profile. These attributes play a critical role in doctors' selection of the most appropriate antidiabetic for a particular patient.

167.     Due to, among other reasons, doctors' perception of Actos' lower association with heart failure, death, and liver toxicity, Actos is significantly differentiated from other drugs in the thiazolidinedione class. For these and other clinical reasons, substantial numbers of doctors significantly prefer Actos to other thiazolidinedione drugs (e.g.,, Avandia (rosiglitazone)). For example, patients aged 65 and older who take Avandia (rosiglitazone) have a

higher rate of death and a greater risk of heart failure when compared with similar patients taking Actos.

168.     At all relevant times, the existence of other products designed to treat adults with type 2 diabetes did not significantly constrain Takeda's pricing of Actos. At all relevant times, Takeda's price for Actos was at least 60% above its marginal cost of production and at least 40% above its marginal cost including marketing costs. Takeda never lowered the price of Actos in response to the pricing of other branded treatments for type 2 diabetes (or the generic versions of such medications).

169.     Takeda needed to control only Actos and its AB-rated generic equivalents, and no other products, in order to profitably maintain the price of Actos at supracompetitive levels. Only the market entry of a competing, AB-rated generic version of Actos would have rendered Takeda unable to profitably maintain supracompetitive prices for Actos.

170.     Takeda knew that entry of a generic version of Actos would be a uniquely significant market event. Takeda predicted that, unlike the entry of other branded treatments for type 2 diabetes (or the generic versions of such medications), entry of generic Actos would take substantial unit sales from Takeda. For example, Actos did not lose substantial sales when generic versions of other branded type 2 diabetes drugs entered the market at low prices. But Takeda predicted that entry of generic Actos would immediately cause branded Actos to lose well more than half of its unit sales. Likewise, Mylan, Ranbaxy, Actavis, and Teva estimated their generic version of Actos would take essentially all of their sales from branded Actos and few, if any, sales from other branded type 2 diabetes drugs (or generic versions of such medications).

171.     Takeda, Mylan, Teva, Ranbaxy, and Actavis predicted that the competitive impact of generic Actos products would be substantial. Among other things, all of the Defendants predicted that the availability of generic Actos would deliver well more than a billion dollars of savings to consumers.

172.     At all relevant times, Takeda sold Actos at prices well over its marginal costs and its competitive price, and enjoyed the resulting high profit margins and corresponding financial benefits—to the financial detriment of Plaintiff and the Actos Class members.

173.     Takeda had, and exercised, the power to exclude and restrict competition to Actos and its AB-rated bioequivalents.

174.     Takeda, at all relevant times, enjoyed high barriers to entry regarding competition in the relevant product market due to patent and other regulatory protections, and the high cost of entry and expansion.

175.     To the extent Plaintiff is legally required to prove monopoly power circumstantially by first defining a relevant product market, Plaintiff alleges the relevant product market is oral pioglitazone hydrochloride for the treatment of adults with type 2 diabetes (*i.e.,* Actos and its AB-rated generic equivalents). During the relevant time, Takeda profitably maintained the price of pioglitazone hydrochloride well above competitive levels.

176.     The relevant geographic market is the United States and its territories.

177.     At all relevant times, Takeda's market share in the relevant geographic market was 100%, confirming its monopoly power.

## IX.     MARKET POWER AND MARKET DEFINITION FOR ACTOPLUS MET

178.     At all relevant times, Takeda had market power over Actoplus met and its generic equivalents because it had the power to maintain the price of Actoplus met at

supracompetitive levels without losing so many sales as to make the supracompetitive price unprofitable.

179.    At all relevant times, a small, but significant, non-transitory price increase above the competitive level for Actoplus met by Takeda would not have caused a loss of sales sufficient to make the price increase unprofitable.

180.    At all relevant times, at competitive price levels Actoplus met did not exhibit significant, positive cross-elasticity of demand regarding price with any product other than AB-rated generic versions of Actoplus met. Other oral Type 2 diabetes medicines are not AB-rated to Actoplus met, cannot be automatically substituted for Actoplus met by pharmacists, do not exhibit substantial cross-price elasticity of demand regarding Actoplus met, and thus, are not economic substitutes for, nor reasonably interchangeable with, Actoplus met.

181.    For clinical reasons, Actop1us met is sufficiently unique from other Type 2 diabetes drugs as it is specifically targeted to and taken by those patients who have not sufficiently improved their blood sugar levels by taking either metformin or pioglitazone alone.

182.    At all relevant times, the existence of other products designed to treat adults with type 2 diabetes did not significantly constrain Takeda's pricing of Actoplus met. At all relevant times, Takeda's price for Actoplus met was at least 60% above its marginal cost of production and at least 40% above its marginal cost, including marketing costs. Takeda never lowered the price of Actoplus met in response to the pricing of other branded treatments for type 2 diabetes (or the generic versions of such medications).

183.    Takeda needed to control only Actoplus met and its AB-rated generic equivalents, and no other products, in order to profitably maintain the price of Actoplus met at supracompetitive levels. Only the market entry of a competing, AB-rated generic version of

184.     Actoplus met would have rendered Takeda unable to profitably maintain supracompetitive prices for Actoplus met.

185.     Takeda knew that entry of a generic version of Actoplus met would be a uniquely significant market event. Takeda predicted that, unlike the entry of other branded treatments for type 2 diabetes (or the generic versions of such medications), entry of generic

186.     Actoplus met would take substantial unit sales from Takeda. For example, Actoplus met did not lose substantial sales when generic versions of other branded type 2 diabetes drugs entered the market at low prices. But Takeda predicted that entry of generic Actoplus met would immediately cause branded Actoplus met to lose well more than half of its unit sales. Likewise, Mylan and Teva estimated their generic version of Actoplus met would take essentially all of their sales from branded Actoplus met and few, if any, sales from other branded type 2 diabetes drugs (or generic versions of such medications).

187.     Takeda, Mylan, and Teva predicted that the competitive impact of generic Actoplus met products would be substantial. Among other things, these Defendants predicted that the availability of generic Actoplus met would deliver hundreds of millions of dollars of savings to consumers.

188.     At all relevant times, Takeda sold Actoplus met at prices well over its marginal costs and its competitive price, and enjoyed the resulting high profit margins and corresponding financial benefits—to the financial detriment of Plaintiff and the Actoplus met Class members.

189.     Takeda had, and exercised, the power to exclude and restrict competition to Actoplus met and its AB-rated bioequivalents.

190.     Takeda, at all relevant times, enjoyed high barriers to entry regarding competition in the relevant product market due to patent and other regulatory protections, and the high cost of entry and expansion.

191.     To the extent Plaintiff is legally required to prove market power circumstantially by first defining a relevant product market, Plaintiff alleges the relevant product market is a fixed unit dose of oral pioglitazone hydrochloride and biguanide to treat adults with type 2 diabetes (*i.e.*, Actoplus met and its AB-rated generic equivalents). During the relevant time, Takeda profitably maintained the price of Actoplus met well above competitive levels.

192.     The relevant geographic market is the United States and its territories.

193.     At all relevant times, Takeda's market share in the relevant geographic market was 100%, confirming its market power.

## X.     MARKET EFFECTS AND DAMAGES TO THE CLASSES

194.     But for the anticompetitive conduct alleged above, generic competition for ACTOS would have begun as early as January 17, 2011, and generic competition for Actoplus met would have begun as early as February 25, 2011.

195.     Defendants' anticompetitive conduct had the purpose and effect of restraining competition unreasonably and injuring competition by protecting Actos and Actoplus met from generic competition. Defendants' unlawful actions allowed Takeda to maintain a monopoly and exclude competition in the market for Actos and its generic equivalents, and to maintain supracompetitive prices for Actoplus met, to the detriment of Plaintiff and the members of the Classes. Defendants' anticompetitive conduct delayed and impaired generic competition and unlawfully enabled Takeda to sell Actos and Actoplus met without timely generic competition.

196.     Typically, generic drugs are initially priced significantly below the corresponding branded drug to which they are AB-rated. As a result, upon generic entry, end-payors rapidly substitute generic versions of the drug for some or all of their purchases. As more generic manufacturers enter the market, prices for generic versions of a branded drug predictably plunge even further due to competition among the generic manufacturers, and, correspondingly, the branded drug loses even more of its market share. This price competition enables purchasers to: (i) purchase generic versions of a drug at substantially lower prices, and (ii) purchase the branded drug at a reduced price. Consequently, brand manufacturers have a keen financial interest in delaying and impairing generic competition, which, in turn causes purchasers to experience substantial increases in costs.

197.     But for Defendants' anticompetitive conduct, end-payors, such as Plaintiff and the Class members, would have paid less by: (i) substituting purchases of less-expensive AB-rated generic Actos and/or Actoplus met for their purchases of more-expensive branded Actos and/or Actoplus met; (ii) receiving discounts on their remaining branded Actos and/or Actoplus met purchases; and/or (iii) purchasing generic Actos and/or Actoplus met at lower prices sooner.

198.     Due to Defendants' anticompetitive conduct, other generic manufacturers were discouraged from and/or delayed in (i) developing and marketing generic versions of Actos and/or Actoplus met, and/or (ii) challenging the validity or infringement of Takeda's patents in court.

199.     During the Class Period, Plaintiff and the End-Payor Class members purchased substantial amounts of Actos and/or Actoplus met. As a direct and proximate result of Defendants' illegal conduct, Plaintiff and the Class members were compelled to pay, and did pay, artificially inflated prices for Actos and/or Actoplus met and their generic equivalents. Plaintiff

and the Class members paid prices that were substantially greater than the prices they otherwise would have paid absent Defendants' illegal conduct because Class members: (i) were deprived of the opportunity to purchase lower-priced generic Actos and/or Actoplus met instead of expensive branded ACTOS and/or Actoplus met; and (ii) paid artificially inflated prices for Actos and/or Actoplus met and their generic equivalents.

200. Defendants' anticompetitive conduct has substantial intrastate effects in that, *infra*, retailers within each state are foreclosed from offering less expensive generic Actos and/or Actoplus met to end-payors inside each respective state. The foreclosure of these generic drugs directly impacts and disrupts commerce for end-payors within each state by forcing them to buy the branded product at the higher price.

201. As a direct and proximate result of Defendants' unlawful anticompetitive scheme and wrongful conduct, Plaintiff and other similarly situated members of each of the Classes have sustained (and continue to sustain) substantial losses and damage to their business and property in the form of overcharges they paid for Actos and/or Actoplus met and their generic equivalents, the exact amount of which will be proven at trial.

202. Defendants' unlawful conduct deprived Plaintiff and members of each of the Classes of the benefits of competition that the antitrust laws were designed to ensure.

## XI.   ANTITRUST IMPACT

203. During the relevant period, Plaintiff and/or members of the Class purchased substantial amounts of branded Actos and Actoplus met indirectly from Takeda. As a result of Defendants' illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for Actos and Actoplus met. Those prices were substantially greater than those that members of the Class would have paid absent the illegal conduct alleged herein.

204.     As a consequence, Plaintiff and members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges.  The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial.

205.     General economic theory recognizes that any overcharge at a higher level of distribution in the chain of distribution for ACTOS and Actoplus met results in higher prices at every level below.  Herbert Hovenkamp, *FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE* p. 624 (1994).  Professor Herbert Hovenkamp goes on to state that "[e]very person at every stage in the chain will be poorer as a result of the monopoly price at the top."  He also acknowledges that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."

206.     Defendants' anticompetitive conduct enabled them to charge consumers indirectly and third-party payors prices in excess of what Defendants otherwise would have been able to charge absent Defendants' anticompetitive conduct.

207.     The prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

208.     The inflated prices the Class paid are traceable to, and the foreseeable result of, the overcharges by Defendants.

## XII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Conspiracy and Combination in Restraint of Trade
Under New York General Business Law § 340
(ActosActos class Against Takeda and Mylan)**

209.        Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

210.        The Reverse Payment Agreement between Takeda and Mylan regarding Actos involves: (i) a payment from Takeda to Mylan; and (ii) an agreement by Mylan to delay marketing its generic Actos. The payments from Takeda to Mylan under the Agreement were the *quid pro quo* for Mylan's agreement to delay marketing its generic versions of ActosActos. Absent the payments, Mylan would not have agreed to delay marketing its generic versions of Actos and would have entered the market sooner than it did.

211.        Defendant Takeda American Holdings, Inc. is a corporation existing under the laws of the State of New York, and is headquartered in the State of New York. Anticompetitive conduct emanated from the State of New York causing injury to end-payors across the United States. The application of New York law is appropriate, as New York has the right to regulate the conduct of its corporations and corporations operating within its territories.

212.        The purpose and effect of the payments flowing from Takeda to Mylan under the agreement was to delay generic competition to Actos and there is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

213.        The purpose and effect of the unlawful Reverse Payment Agreement between Takeda and Mylan was to allocate 100% of the market for Actos and its generic

equivalents in the United States to Takeda, delay the sale of generic Actos products, and fix the price at which consumers and other end payors would pay for Actos and its generic equivalents at the higher, branded price.

214.     The Reverse Payment Agreement harmed competition.

215.     As a direct and proximate result of Takeda's and MyIan's unlawful restraint of trade, Plaintiff and members of the Actos Class paid artificially inflated prices for Actos and its generic equivalents as described herein, and were harmed as a result.

216.     Plaintiff and members of the Actos Class have been injured in their business or property by reason of Takeda's and Mylan's antitrust violations, in that Plaintiff and the Actos Class: (1) were denied the opportunity to purchase lower-priced generic Actos; and (2) paid higher prices for branded Actos than they would have paid in the absence of the unlawful conduct. These injuries are of the type New York General Business Law § 340 was designed to prevent, and flow from that which makes the conduct unlawful.

217.     Plaintiff and the Actos Class seek damages and multiple damages as permitted by law for their injuries.

## SECOND CLAIM FOR RELIEF

### Conspiracy and Combination in Restraint of Trade
### Under New York General Business Law § 349
### (ActosActos class Against Takeda and Mylan)

218.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

219.     The Reverse Payment Agreement between Takeda and Mylan regarding Actos involves: (i) a payment from Takeda to Mylan; and (ii) an agreement by Mylan to delay marketing its generic Actos. The payments from Takeda to Mylan under the Agreement were the *quid pro quo* for Mylan's agreement to delay marketing its generic versions of ActosActos.

Absent the payments, Mylan would not have agreed to delay marketing its generic versions of Actos and would have entered the market sooner than it did.

220.     Defendant Takeda American Holdings, Inc. is a corporation existing under the laws of the State of New York, and is headquartered in the State of New York. Anticompetitive conduct emanated from the State of New York causing injury to end-payors across the United States. The application of New York law is appropriate, as New York has the right to regulate the conduct of its corporations and corporations operating within its territories.

221.     Anticompetitive The New York, as New York The purpose and effect of the payments flowing from Takeda to Mylan under the agreement was to delay generic competition to Actos and there is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

222.     The purpose and effect of the unlawful Reverse Payment Agreement between Takeda and Mylan was to allocate 100% of the market for Actos and its generic equivalents in the United States to Takeda, delay the sale of generic Actos products, and fix the price at which consumers and other end payors would pay for Actos and its generic equivalents at the higher, branded price.

223.     The Reverse Payment Agreement harmed competition.

224.     As a direct and proximate result of Takeda's and MyIan's unlawful restraint of trade, Plaintiff and members of the Actos Class paid artificially inflated prices for Actos and its generic equivalents as described herein, and were harmed as a result.

225.     Plaintiff and members of the Actos Class have been injured in their business or property by reason of Takeda's and Mylan's consumer protection violations, in that Plaintiff and the Actos Class: (1) were denied the opportunity to purchase lower-priced generic Actos; and (2) paid higher prices for branded Actos than they would have paid in the absence of the unlawful conduct. These injuries are of the type New York General Business Law § 349 was designed to prevent, and flow from that which makes the conduct unlawful.

226.     Plaintiff and the Actos Class seek damages and multiple damages as permitted by law for their injuries.

### THIRD CLAIM FOR RELIEF

**Conspiracy and Combination in Restraint of Trade**
**Under New York General Business Law § 340**
**(ActosActos Class Against Takeda and Ranbaxy)**

227.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

228.     The Reverse Payment Agreement between Takeda and Ranbaxy regarding Actos involves: (a) a payment from Takeda to Ranbaxy; and (b) an agreement by Ranbaxy to delay marketing its generic Actos. The payments from Takeda to Ranbaxy under the Agreement were the *quid pro quo* for Ranbaxy's agreement to delay marketing its generic versions of Actos. Absent the payments, Ranbaxy would not have agreed to delay marketing its generic versions of Actos and would have entered the market sooner than it did.

229.     Defendant Takeda American Holdings, Inc. is a corporation existing under the laws of the State of New York, and is headquartered in the State of New York. Anticompetitive conduct emanated from the State of New York causing injury to end-payors across the United States. The application of New York law is appropriate, as New York has the right to regulate the conduct of its corporations and corporations operating within its territories.

230.     The purpose and effect of the payments flowing from Takeda to Ranbaxy under the agreement was to delay generic competition to Actos and there is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

231.     The purpose and effect of the unlawful Reverse Payment Agreement between Takeda and Ranbaxy was to allocate 100% of the market for Actos and its generic equivalents in the United States to Takeda, delay the sales of generic Actos products, and fix the price at which consumers and other end payors would pay for Actos and its generic equivalents at the higher, branded price.

232.     The Reverse Payment Agreement harmed competition.

233.     As a direct and proximate result of Takeda's and Ranbaxy's unlawful restraint of trade, Plaintiff and members of the Actos Class paid artificially inflated prices for Acttos and its generic equivalents as described herein, and were harmed as a result.

234.     Plaintiff and members of the Actos Class have been injured in their business or property by reason of Takeda's and Ranbaxy's antitrust violations, in that Plaintiff and the Actos Class: (1) were denied the opportunity to purchase lower-priced generic Actos; and (2) paid higher prices for branded Actos than they would have paid in the absence of the unlawful conduct. These injuries are of the type New York General Business Law § 340 was designed to prevent, and flow from that which makes the conduct unlawful.

235.     Plaintiff and the Actos Class seek damages and multiple damages as permitted by law for their injuries.

## FOURTH CLAIM FOR RELIEF

**Conspiracy and Combination in Restraint of Trade
Under New York General Business Law § 349
(ActosActos Class Against Takeda and Ranbaxy)**

236.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

237.     The Reverse Payment Agreement between Takeda and Ranbaxy regarding Actos involves: (a) a payment from Takeda to Ranbaxy; and (b) an agreement by Ranbaxy to delay marketing its generic Actos. The payments from Takeda to Ranbaxy under the Agreement were the *quid pro quo* for Ranbaxy's agreement to delay marketing its generic versions of Actos. Absent the payments, Ranbaxy would not have agreed to delay marketing its generic versions of Actos and would have entered the market sooner than it did.

238.     Defendant Takeda American Holdings, Inc. is a corporation existing under the laws of the State of New York, and is headquartered in the State of New York. Anticompetitive The New York, as New YorkThe purpose and effect of the payments flowing from Takeda to Ranbaxy under the agreement was to delay generic competition to Actos and there is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

239.     The purpose and effect of the unlawful Reverse Payment Agreement between Takeda and Ranbaxy was to allocate 100% of the market for Actos and its generic equivalents in the United States to Takeda, delay the sales of generic Actos products, and fix the price at which consumers and other end payors would pay for Actos and its generic equivalents at the higher, branded price.

240.     The Reverse Payment Agreement harmed competition.

241.     As a direct and proximate result of Takeda's and Ranbaxy's unlawful restraint of trade, Plaintiff and members of the Actos Class paid artificially inflated prices for Actos and its generic equivalents as described herein, and were harmed as a result.

242.     Plaintiff and members of the Actos Class have been injured in their business or property by reason of Takeda's and Ranbaxy's consumer protection violations, in that Plaintiff and the Actos Class: (1) were denied the opportunity to purchase lower-priced generic Actos; and (2) paid higher prices for branded Actos than they would have paid in the absence of the unlawful conduct. These injuries are of the type New York General Business Law § 349 was designed to prevent, and flow from that which makes the conduct unlawful.

243.     Plaintiff and the Actos Class seek damages and multiple damages as permitted by law for their injuries.

## FIFTH CLAIM FOR RELIEF

### Conspiracy and Combination in Restraint of Trade Under
### New York General Business Law § 340
### (ActosActos Class Against Takeda and Actavis)

244.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

245.     The Reverse Payment Agreement between Takeda and Actavis regarding Actos involves: (a) a payment from Takeda to Actavis; and (b) an agreement by Actavis to delay marketing its generic Actos. The payments from Takeda to Actavis under the Agreement were the *quid pro quo* for Actavis's agreement to delay marketing its generic versions of Actos. Absent the payments, Actavis would not have agreed to delay marketing its generic versions of Actos

246.     Defendant Takeda American Holdings, Inc. is a corporation existing under the laws of the State of New York, and is headquartered in the State of New York. Anticompetitive conduct emanated from the State of New York causing injury to end-payors

across the United States. The application of New York law is appropriate, as New York has the right to regulate the conduct of its corporations and corporations operating within its territories.

247.     The purpose and effect of the payments flowing from Takeda to Actavis under the agreement was to delay generic competition to Actos and there is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

248.     The purpose and effect of the unlawful Reverse Payment Agreement between Takeda and Actavis was to allocate 100% of the market for Actos and its generic equivalents in the United States to Takeda, delay the sales of generic Actos products, and fix the price at which consumers and other end payors would pay for Actos and its generic equivalents at the higher, branded price.

249.     The Reverse Payment Agreement harmed competition.

250.     As a direct and proximate result of Takeda's and Actavis's unlawful restraint of trade, Plaintiff and members of the Actos Class paid artificially inflated prices for Actos and its generic equivalents as described herein, and were harmed as a result.

251.     Plaintiff and members of the Actos Class have been injured in their business or property by reason of Takeda's and Ranbaxy's antitrust violations, in that Plaintiff and the Actos Class: (1) were denied the opportunity to purchase lower-priced generic Actos; and (2) paid higher prices for branded Actos than they would have paid in the absence of the unlawful conduct. These injuries are of the type New York General Business Law § 340 was designed to prevent, and flow from that which makes the conduct unlawful.

252.     Plaintiff and the Actos Class seek damages and multiple damages as permitted bylaw for their injuries.

### SIXTH CLAIM FOR RELIEF

**Conspiracy and Combination in Restraint of Trade Under**
**New York General Business Law § 349**
**(ActosActos Class Against Takeda and Actavis)**

253.     ActosPlaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

254.     The Reverse Payment Agreement between Takeda and Actavis regarding Actos involves: (a) a payment from Takeda to Actavis; and (b) an agreement by Actavis to delay marketing its generic Actos. The payments from Takeda to Actavis under the Agreement were the *quid pro quo* for Actavis's agreement to delay marketing its generic versions of Actos. Absent the payments, Actavis would not have agreed to delay marketing its generic versions of  and would have entered the market sooner than it did.

255.      Anticompetitive conduct emanated from the State of New York causing injury to end-payors across the United States. The application of New York law is appropriate, as New York has the right to regulate the conduct of its corporations and corporations operating within its territories.

256.     Defendant Takeda American Holdings, Inc. is a corporation existing under the laws of the State of New York, and is headquartered in the State of New York.The purpose and effect of the payments flowing from Takeda to Actavis under the agreement was to delay generic competition to Actos and there is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

257.     The purpose and effect of the unlawful Reverse Payment Agreement between Takeda and Actavis was to allocate 100% of the market for Actos and its generic equivalents in the United States to Takeda, delay the sales of generic Actos products, and fix the price at which consumers and other end payors would pay for Actos and its generic equivalents at the higher, branded price.

258.     The Reverse Payment Agreement harmed competition.

259.     As a direct and proximate result of Takeda's and Actavis's unlawful restraint of trade, Plaintiff and members of the Actos Class paid artificially inflated prices for Actos and its generic equivalents as described herein, and were harmed as a result.

260.     Plaintiff and members of the Actos Class have been injured in their business or

261.     property by reason of Takeda's and Actavis's consumer protection violations, in that Plaintiff and the Actos Class: (1) were denied the opportunity to purchase lower-priced generic Actos; and (2) paid higher prices for branded Actos than they would have paid in the absence of the unlawful conduct. These injuries are of the type New York General Business Law § 349 was designed to prevent, and flow from that which makes the conduct unlawful.

262.     Plaintiff and the Actos Class seek damages and multiple damages as permitted by law for their injuries.

**SEVENTH CLAIM FOR RELIEF**

**Conspiracy and Combination in Restraint of Trade
Under New York State General Business Law §340
(Actos class Against Takeda and Teva)**

263.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

264.     The Reverse Payment Agreement between Takeda and Teva involves: (a) a payment from Takeda to Teva; and (b) an agreement by Teva to delay marketing its generic Actos. The payments from Takeda to Teva under the Agreement were the *quid pro quo* for Teva's agreement to delay marketing its generic versions of Actos. Absent the payments, Teva would not have agreed to delay marketing its generic versions of Actos and would have entered the market sooner than it did.

265.     Defendant Takeda American Holdings, Inc. is a corporation existing under the laws of the State of New York Anticompetitive conduct emanated from the State of New York causing injury to end-payors across the United States. The application of New York law is appropriate, as New York has the right to regulate the conduct of its corporations and corporations operating within its territories.

266.     , and is headquartered in the State of New York. Anticompetitive conduct emanated from the State of New York causing injury to end-payors across the United States. The application of New York law is appropriate, as New York has the right to regulate the conduct of its corporations and corporations operating within its territories.

267.     The purpose and effect of the payments flowing from Takeda to Teva under the agreement was to delay generic competition to Actos and there is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

268.     The purpose and effect of the unlawful Reverse Payment Agreement between Takeda and Teva was to allocate 100% of the market for Actos and its generic equivalents in the United States to Takeda, delay the sales of generic Actos products, and fix the

price at which consumers and other end payors would pay for Actos and its generic equivalents at the higher, branded price.

269.        The Reverse Payment Agreement harmed competition.

270.        As a direct and proximate result of Takeda's and Teva's unlawful restraint of trade, Plaintiff and members of the Actos Class paid artificially inflated prices for Actos and its generic equivalents as described herein, and were harmed as a result.

271.        Plaintiff and members of the Actos Class have been injured in their business or property by reason of Takeda's and Teva's antitrust violations, in that Plaintiff and the Actos Class: (1) were denied the opportunity to purchase lower-priced generic Actos; and (2) paid higher prices for branded Actos than they would have paid in the absence of the unlawful conduct. These injuries are of the type New York General Business Law § 340 was designed to prevent, and flow from that which makes the conduct unlawful.

272.        Plaintiff and the Actos Class seek damages and multiple damages as permitted by law for their injuries.

## EIGHTH CLAIM FOR RELIEF

### Conspiracy and Combination in Restraint of Trade
### Under New York State General Business Law §349
### (Actos class Against Takeda and Teva)

273.        Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

274.        The Reverse Payment Agreement between Takeda and Teva involves: (a) a payment from Takeda to Teva; and (b) an agreement by Teva to delay marketing its generic Actos. The payments from Takeda to Teva under the Agreement were the *quid pro quo* for Teva's agreement to delay marketing its generic versions of Actos. Absent the payments, Teva would

not have agreed to delay marketing its generic versions of Actos and would have entered the market sooner than it did.

275.     Defendant Takeda American Holdings, Inc. is a corporation existing under the laws of the State of New York, and is headquartered in the State of New York. Anticompetitive conduct emanated from the State of New York causing injury to end-payors across the United States. The application of New York law is appropriate, as New York has the right to regulate the conduct of its corporations and corporations operating within its territories.

276.     The purpose and effect of the payments flowing from Takeda to Teva under the agreement was to delay generic competition to Actos and there is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

277.     The purpose and effect of the unlawful Reverse Payment Agreement between Takeda and Teva was to allocate 100% of the market for Actos and its generic equivalents in the United States to Takeda, delay the sales of generic Actos products, and fix the price at  which consumers and other end payors would pay for Actos and its generic equivalents at the higher, branded price.

278.     The Reverse Payment Agreement harmed competition. As a direct and proximate result of Takeda's and Teva's unlawful restraint of trade, Plaintiff and members of the Actos Class paid artificially inflated prices for ActosActos and its generic equivalents as described herein, and were harmed as a result.

279.     Plaintiff and members of the Actos Class have been injured in their business or  property by reason of Takeda's and Teva's consumer protection violations, in that

Plaintiff and the Actos Class: (1) were denied the opportunity to purchase lower-priced generic Actos; and (2) paid higher prices for branded Actos than they would have paid in the absence of the unlawful conduct. These injuries are of the type New York General Business Law § 349 was designed to prevent, and flow from that which makes the conduct unlawful.

280.     Plaintiff and the Actos Class seek damages and multiple damages as permitted by law for their injuries.

### NINTH CLAIM FOR RELIEF

**Conspiracy and Combination in Restraint of Trade
Under New York State General Business Law §§ 340 and 349
(Actos class Against All Defendants)**

281.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

282.     Through an overarching anticompetitive scheme, including the Reverse Payment Agreements between Takeda and each of Mylan, Ranbaxy, Actavis, and Teva, all Defendants conspired to block and delay the entry into the market of generic Actos. The purpose and effect of the conspiracy was to allocate 100% of the market for Actos and its generic equivalents in the United States to Takeda, delay the sale of generic Actos products, and fix the price at which consumers and other end payors would pay for Actos and its generic equivalents at the higher, branded price. Absent the conspiracy, generic versions of Actos would have entered the market sooner than they did.

283.     Defendant Takeda American Holdings, Inc. is a corporation existing under the laws of the State of New York, and is headquartered in the State of New York. Anticompetitive conduct emanated from the State of New York causing injury to end-payors across the United States. The application of New York law is appropriate, as New York has the right to regulate the conduct of its corporations and corporations operating within its territories.

284.     There is and was no legitimate, non-pretextual, procompetitive business justification for the conspiracy that outweighs its harmful effect. Even if there were some such conceivable justification, the unlawful agreement between and among the Defendants were not necessary to achieve such a purpose.

285.     Each Defendant committed at least one overt act in furtherance of the conspiracy.

286.     The unlawful conspiracy harmed competition.

287.     As a direct and proximate result of Defendants' unlawful restraint of trade, Plaintiff and members of the Actos Class paid artificially inflated prices for ACTOS and its generic equivalents as described herein, and were harmed as a result.

288.     Plaintiff and members of the Actos Class have been injured in their business or property by reason of Defendants' antitrust and consumer protection violations, in that Plaintiff and the Actos Class: (1) were denied the opportunity to purchase lower-priced generic Actos; and (2) paid higher prices for branded Actos than they would have paid in the absence of the unlawful conduct. These injuries are of the type New York General Business Law §§ 340 and 349 was designed to prevent, and flow from that which makes the conduct unlawful.

289.     Plaintiff and the Actos Class seek damages and multiple damages as permitted by law for their injuries.

### TENTH CLAIM FOR RELIEF

**Conspiracy and Combination in Restraint of Trade**
**Under New York State General Business Law §340**
**(Actoplus met Class Against Takeda and Mylan)**

290.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

291.    The Reverse Payment Agreement between Takeda and Mylan regarding Actoplus met involves: (a) a payment from Takeda to Mylan; and (b) an agreement by Mylan to delay marketing its generic Actoplus met. The payments from Takeda to Mylan under the Agreement were the *quid pro quo* for Mylan's agreement to delay marketing its generic versions of Actoplus met. Absent the payments, Mylan would not have agreed to delay marketing its generic versions of Actoplus met and would have entered the market sooner than it did.

292.    Defendant Takeda American Holdings, Inc. is a corporation existing under the laws of the State of New York, and is headquartered in the State of New York. Anticompetitive conduct emanated from the State of New York causing injury to end-payors across the United States. The application of New York law is appropriate, as New York has the right to regulate the conduct of its corporations and corporations operating within its territories.

293.    The purpose and effect of the payments flowing from Takeda to Mylan under the agreement was to delay generic competition to Actoplus met and there is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

294.    The purpose and effect of the unlawful Reverse Payment Agreement between Takeda and Mylan was to allocate 100% of the market for Actoplus met and its generic equivalents in the United States to Takeda, delay the sale of generic Actoplus met products, and fix the price at which consumers and other end payors would pay for Actoplus met and its generic equivalents at the higher, branded price.

295.    The Reverse Payment Agreement harmed competition.

296. As a direct and proximate result of Takeda's and Mylan's unlawful restraint of trade, Plaintiff and members of the Actoplus met Class paid artificially inflated prices for Actoplus met and its generic equivalents as described herein, and were harmed as a result.

297. Plaintiff and members of the Actoplus met Class have been injured in their business or property by reason of Takeda's and Mylan's antitrust violations, in that Plaintiff and the Actoplus met Class: (1) were denied the opportunity to purchase lower-priced generic Actoplus met; and (2) paid higher prices for branded Actoplus met than they would have paid in the absence of the unlawful conduct. These injuries are of the type New York General Business Law § 340 was designed to prevent, and flow from that which makes the conduct unlawful.

298. Plaintiff and the Actoplus met Class seek damages and multiple damages as permitted by law for their injuries.

## ELEVENTH CLAIM FOR RELIEF

### Conspiracy and Combination in Restraint of Trade
### Under New York State General Business Law §349
### (Actoplus met Class Against Takeda and Mylan)

299. Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

300. The Reverse Payment Agreement between Takeda and Mylan regarding Actoplus met involves: (a) a payment from Takeda to Mylan; and (b) an agreement by Mylan to delay marketing its generic Actoplus met. The payments from Takeda to Mylan under the Agreement were the *quid pro quo* for Mylan's agreement to delay marketing its generic versions of Actoplus met. Absent the payments, Mylan would not have agreed to delay marketing its generic versions of Actoplus met and would have entered the market sooner than it did.

301. Defendant Takeda American Holdings, Inc. is a corporation existing under the laws of the State of New York, and is headquartered in the State of New York. Anticompetitive

conduct emanated from the State of New York causing injury to end-payors across the United States. The application of New York law is appropriate, as New York has the right to regulate the conduct of its corporations and corporations operating within its territories.

302.     The purpose and effect of the payments flowing from Takeda to Mylan under the agreement was to delay generic competition to Actoplus met and there is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

303.     The purpose and effect of the unlawful Reverse Payment Agreement between Takeda and Mylan was to allocate 100% of the market for Actoplus met and its generic equivalents in the United States to Takeda, delay the sale of generic Actoplus met products, and fix the price at which consumers and other end payors would pay for Actoplus met and its generic equivalents at the higher, branded price.

304.     The Reverse Payment Agreement harmed competition.

305.     As a direct and proximate result of Takeda's and Mylan's unlawful restraint of trade, Plaintiff and members of the Actoplus met Class paid artificially inflated prices for Actoplus met and its generic equivalents as described herein, and were harmed as a result.

306.

Plaintiff and members of the Actoplus met Class have been injured in their business or property by reason of Takeda's and Mylan's consumer protectionviolations, in that Plaintiff and the Actoplus met Class: (1) were denied the opportunity to purchase lower-priced generic Actoplus met; and (2) paid higher prices for branded Actoplus than they would have paid in the absence of

the unlawful conduct. These injuries are of the type New York General Business Law § 349 was designed to prevent, and flow from that which makes the conduct unlawful.

307.     Plaintiff and the Actoplus met Class seek damages and multiple damages as permitted by law for their injuries.

## TWELFTH CLAIM FOR RELIEF

### Conspiracy and Combination in Restraint of Trade
### Under New York State General Business Law §340
### (Actoplus met Class Against Takeda and Teva)

308.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

309.     The Reverse Payment Agreement between Takeda and Teva regarding Actoplus met involves: (a) a payment from Takeda to Teva; and (b) an agreement by Teva to delay marketing its generic Actoplus met. The payments from Takeda to Teva under the Agreement were the *quid pro quo* for Teva's agreement to delay marketing its generic versions of Actoplus met. Absent the payments, Teva would not have agreed to delay marketing its generic versions of Actoplus met and would have entered the market sooner than it did.

310.     Defendant Takeda American Holdings, Inc. is a corporation existing under the laws of the State of New York, and is headquartered in the State of New York. Anticompetitive conduct emanated from the State of New York causing injury to end-payors across the United States. The application of New York law is appropriate, as New York has the right to regulate the conduct of its corporations and corporations operating within its territories.

311.     The purpose and effect of the payments flowing from Takeda to Teva under the agreement was to delay generic competition to Actoplus met and there is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs

their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

312.       The purpose and effect of the unlawful Reverse Payment Agreement between Takeda and Teva was to allocate 100% of the market for Actoplus met and its generic equivalents in the United States to Takeda, delay the sale of generic Actoplus met products, and fix the price at which consumers and other end payors would pay for Actoplus met and its generic equivalents at the higher, branded price.

313.       The Reverse Payment Agreement harmed competition.

314.       As a direct and proximate result of Takeda's and Teva's unlawful restraint of trade, Plaintiff and members of the Actoplus met Class paid artificially inflated prices for Actoplus met and its generic equivalents as described herein, and were harmed as a result.

315.

Plaintiff and members of the ActoplusActoplus Class have been injured in their business or property by reason of Takeda's and Teva's antitrust violations, in that Plaintiff and the Actoplus met Class: (1) were denied the opportunity to purchase lower-priced generic Actoplus met; and (2) paid higher prices for branded Actoplus met than they would have paid in the absence of the unlawful conduct. These injuries are of the type New York General Business Law § 340 was designed to prevent, and flow from that which makes the conduct unlawful.

316.       Plaintiff and the Actoplus met Class seek damages and multiple damages as permitted by law for their injuries.

### THIRTEENTH CLAIM FOR RELIEF

**Conspiracy and Combination in Restraint of Trade
Under New York State General Business Law §349
(Actoplus met Class Against Takeda and Teva)**

317. Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

318. The Reverse Payment Agreement between Takeda and Teva regarding Actoplus met involves: (a) a payment from Takeda to Teva; and (b) an agreement by Teva to delay marketing its generic Actoplus met. The payments from Takeda to Teva under the Agreement were the *quid pro quo* for Teva's agreement to delay marketing its generic versions of Actoplus met. Absent the payments, Teva would not have agreed to delay marketing its generic versions of Actoplus met and would have entered the market sooner than it did.

319. Defendant Takeda American Holdings, Inc. is a corporation existing under the laws of the State of New York, and is headquartered in the State of New York. Anticompetitive conduct emanated from the State of New York causing injury to end-payors across the United States. The application of New York law is appropriate, as New York has the right to regulate the conduct of its corporations and corporations operating within its territories.

320. The purpose and effect of the payments flowing from Takeda to Teva under the agreement was to delay generic competition to Actoplus met and there is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs

321. their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

322. The purpose and effect of the unlawful Reverse Payment Agreement between Takeda and Teva was to allocate 100% of the market for Actoplus met and its generic equivalents in the United States to Takeda, delay the sale of generic Actoplus met products, and

fix the price at which consumers and other end payors would pay for Actoplus met and its generic equivalents at the higher, branded price.

323.     The Reverse Payment Agreement harmed competition.

324.     As a direct and proximate result of Takeda's and Teva's unlawful restraint of trade, Plaintiff and members of the Actoplus met Class paid artificially inflated prices for Actoplus met and its generic equivalents as described herein, and were harmed as a result.

325.     Plaintiff and members of the ActoplusActoplus met Class have been injured in their business or property by reason of Takeda's and Teva's consumer protection violations, in that Plaintiff and the Actoplus met Class: (1) were denied the opportunity to purchase lower-priced generic ActoplusActoplus; and (2) paid higher prices for branded ActoplusActoplus met than they would have paid in the absence of the unlawful conduct. These injuries are of the type New York General Business Law § 349 was designed to prevent, and flow from that which makes the conduct unlawful.

326.     Plaintiff and the Actoplus met Class seek damages and multiple damages as permitted by law for their injuries.

## FOURTEENTH CLAIM FOR RELIEF

### Monopolization and Monopolistic Scheme
### Under New York General Business Law § 340
### (ActosActos Class Against Takeda)

327.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

328.     At all relevant times, Takeda possessed substantial market power (*i.e.*, monopoly power) regarding Actos and its generic equivalents. Takeda possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the sale of ACTOS and its generic equivalents.

329.     Defendant Takeda American Holdings, Inc. is a corporation existing under the laws of the State of New York, and is headquartered in the State of New York. Anticompetitive conduct emanated from the State of New York causing injury to end-payors across the United States. The application of New York law is appropriate, as New York has the right to regulate the conduct of its corporations and corporations operating within its territories.

330.     Through the overarching anticompetitive scheme, as alleged extensively above,

331.     Takeda willfully maintained its monopoly power regarding ACTOS and its generic equivalents, using restrictive or exclusionary conduct, rather than with greater business acumen, and injured Plaintiff and the ActosActos Class. Takeda's exclusionary conduct under this anticompetitive scheme included improperly listing the '584 Patent and '404 Patent in the Orange Book as drug product patents for ActosActos; entering into the Reverse Payment Agreements with Mylan, Ranbaxy, and Actavis, regarding ActosActos; intentionally creating a "bottleneck" to prevent later-filing generic manufacturers from entering the market before August 17, 2011; including the "acceleration clauses" in the agreements with Mylan, Ranbaxy, and Actavis with the purpose and effect of deterring Teva from unraveling those anticompetitive agreements; and paying off Teva with the same purpose and effect.

332.     It was Takeda's conscious objective to further its dominance regarding the sale of

333.     ACTOS and its generic equivalents through the overarching anticompetitive scheme.

334.     Takeda's scheme harmed competition as alleged above.

74

335.     As a direct and proximate result of Takeda's illegal and monopolistic conduct, as alleged, Plaintiff and the Class were injured.

336.     Plaintiff and members of the Actos Class have been injured in their business or property by reason of Takeda's and Teva's antitrust violations, in that Plaintiff and the Actos met Class: (1) were denied the opportunity to purchase lower-priced generic Actos; and (2) paid higher prices for branded Actos than they would have paid in the absence of the unlawful conduct. These injuries are of the type New York General Business Law § 340 was designed to prevent, and flow from that which makes the conduct unlawful.

337.     Plaintiff and the Actos met Class seek damages and multiple damages as permitted by law for their injuries.

## FIFTEENTH CLAIM FOR RELIEF

### Attempted Monopolization Under General Business Law § 340
### (ActosActos Class Against Takeda)

338.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

339.     Takeda, through its overarching anticompetitive scheme, specifically intended to maintain monopoly power in the relevant market. It was Takeda's conscious objective to control prices and/or to exclude competition in the relevant market.

340.     Defendant Takeda American Holdings, Inc. is a corporation existing under the laws of the State of New York, and is headquartered in the State of New York. Anticompetitive conduct emanated from the State of New York causing injury to end-payors across the United States. The application of New York law is appropriate, as New York has the right to regulate the conduct of its corporations and corporations operating within its territories.

341.     The natural, intended, and foreseeable consequence of Takeda's overarching anticompetitive scheme was to control prices and exclude competition in the relevant market, to the extent it did not succeed.

342.     There was a substantial and real chance, a reasonable likelihood, and/or a probability that Takeda would succeed in and achieve its goal of maintaining monopoly power in the relevant market.

343.     As a direct and proximate result of Takeda's illegal and monopolistic conduct, Plaintiff and the Actos Class were harmed as alleged above.

344.     Plaintiff and members of the Actos Class have been injured in their business or property by reason of Takeda's and Teva's antitrust violations, in that Plaintiff and the Actos met Class: (1) were denied the opportunity to purchase lower-priced generic Actos; and (2) paid higher prices for branded Actos than they would have paid in the absence of the unlawful conduct. These injuries are of the type New York General Business Law § 340 was designed to prevent, and flow from that which makes the conduct unlawful.

345.     Plaintiff and the Actos met Class seek damages and multiple damages as permitted by law for their injuries

### SIXTEENTH CLAIM FOR RELIEF

### Conspiracy and Combination in Restraint of Trade Under State Law
### (Actos Class Against Takeda and Mylan)

346.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

347.     The Reverse Payment Agreement between Takeda and Mylan regarding Actos involves: (i) a payment from Takeda to Mylan; and (ii) an agreement by Mylan to delay marketing its generic ActosActos. The payments from Takeda to Mylan under the Agreement

were the *quid pro quo* for Mylan's agreement to delay marketing its generic versions of Actos. Absent the payments, Mylan would not have agreed to delay marketing its generic versions of Actos and would have entered the market sooner than it did.

348.　　The purpose and effect of the payments flowing from Takeda to Mylan under the agreement was to delay generic competition to Actos and there is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

349.　　The purpose and effect of the unlawful Reverse Payment Agreement between Takeda and Mylan was to allocate 100% of the market for Actos and its generic equivalents in the United States to Takeda, delay the sale of generic Actos products, and fix the price at which consumers and other end payors would pay for Actos and its generic equivalents at the higher, branded price.

350.　　The Reverse Payment Agreement harmed competition.

351.　　As a direct and proximate result of Takeda's and Mylan's unlawful restraint of trade, Plaintiff and members of the Actos Class paid artificially inflated prices for Actos and its generic equivalents as described herein, and were harmed as a result.

352.　　By engaging in the foregoing conduct, Takeda and Mylan violated the following state laws:

      a.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Ala. Code § 8-10-3, with respect to purchases of Actos in Alabama by members of the Actos Class.

      b.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Arizona Rev. Stat. §§ 44-1401, *et seq.,* with respect to purchases of Actos in Arizona by members of the Actos Class.

77

c.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Cal. Bus. Code §§ 16700, *et seq.,* and Code §§ 17200, *et seq.,* with respect to purchases of Actos in California by members of the Actos Class.

d.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of D.C. Code Ann. §§ 28-45031, *et seq.,* with respect to purchases of Actos in the District of Columbia by members of the Actos Class.

e.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Fla. Stat. §§ 501. Part II, *et seq.,* with respect to purchases of Actos in Florida by members of the Actos Class, and this conduct constitutes a predicate act under the Florida Deceptive Practices Act.

f.   Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Hawaii Code §480, *et seq*., with respect to purchases of Actos in Hawaii by members of the Actos Class.

g.   Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Iowa Code § 553, *et seq*., with respect to purchases of Actos in Iowa by members of the ActosActos Class.

h.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq.,* with respect to purchases of Actos in Kansas by members of the Actos Class.

i.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Me. Rev. Stat. Ann. 10, § 1101, *et seq.,* with respect to purchases of Actos in Maine by members of the Actos Class.

j.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Mass. Ann. Laws ch. 93, *et seq*., with respect to purchases of Actos in Massachusetts by members of the Actos Class.

k.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.771, *et seq*., with respect to purchases of Actos in Michigan by members of the Actos Class.

l.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Minn. Stat. §§ 325D.52, *et seq*., with respect to purchases of Actos Minnesota by members of the Actos Class.

m.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq*., with respect to purchases of Actos in Mississippi by members of the Actos Class.

n.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Neb. Code Ann. §§ 59-801, *et seq*., with respect to purchases of Actos in Nebraska by members of the Actos Class.

o.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, *et seq*., with respect to purchases of Actos in Nevada by members of the Actos Class, in that thousands of sales of Actos took place at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct.

p.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, *et seq*., with respect to purchases of Actos in New Mexico by members of the Actos Class.

q.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of New York General Business Law § 340, *et seq*., with respect to purchases of Actos in New York by members of the Actos Class.

r.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, *et seq*., with respect to purchases of Actos in North Carolina by members of the Actos Class.

s.      Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of N.D. Cent. Code § 51-08.1-01, *et seq*., with respect to purchases of Actos in North Dakota by members of the Actos Class.

t.      Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of 10 L.P.R.A. § 258 with respect to purchases of Actos in Puerto Rico by members of the Actos Class.

u.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of R.I. Gen. Laws §§ 6-36-5, *et seq*., with respect to purchases of Actos in Rhode Island by members of the Actos Class.

v.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of S.D. Codified Laws Ann. § 37-1, *et seq*., with respect to purchases of Actos in South Dakota by members of the Actos Class.

w.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq*., with respect to purchases of Actos in Tennessee by members of the Actos Class, in that the actions and transactions alleged herein substantially affected Tennessee with thousands of end-payors in Tennessee paying substantially higher prices for Actos at Tennessee pharmacies.

x.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Utah Code Ann. §§ 76-10-911, *et seq.,* with respect to purchases of Actos in Utah by residents of Utah who are members of the Actos Class.

y.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Vt. Stat. Ann. 9, § 2453, *et seq*., with respect to purchases of Actos in Vermont by members of the Actos Class.

z.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of W.Va. Code §§ 47-18-1, *et seq*., with respect to purchases of Actos in West Virginia by members of the Actos Class.

aa.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Wis. Stat. § 133.01, *et seq*., with respect to purchases of Actos in Wisconsin by members of the Actos Class, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher price for Actos at Wisconsin pharmacies.

353.   Plaintiff and members of the Actos Class have been injured in their business or property by reason of Takeda's and Mylan's antitrust violations, in that Plaintiff and

the Actos Class: (i) were denied the opportunity to purchase lower-priced generic Actos; and (ii) paid higher prices for branded Actos than they would have paid in the absence of the unlawful conduct. These injuries are of the type the laws of the above States, the District of Columbia and Puerto Rico were designed to prevent, and flow from that which makes the conduct unlawful.

354.     Plaintiff and the Actos Class seek damages and multiple damages as permitted by law for their injuries.

## SEVENTEENTH CLAIM FOR RELIEF

### Conspiracy and Combination in Restraint of Trade Under State Law
### (Actos Class Against Takeda and Ranbaxy)

355.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

356.     The Reverse Payment Agreement between Takeda and Ranbaxy regarding Actos involves: (i) a payment from Takeda to Ranbaxy; and (ii) an agreement by Ranbaxy to delay marketing its generic Actos. The payments from Takeda to Ranbaxy under the Agreement were the *quid pro quo* for Ranbaxy's agreement to delay marketing its generic versions of Actos. Absent the payments, Ranbaxy would not have agreed to delay marketing its generic versions of Actos and would have entered the market sooner than it did.

357.     The purpose and effect of the payments flowing from Takeda to Ranbaxy under the agreement was to delay generic competition to Actos and there is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

358.     The purpose and effect of the unlawful Reverse Payment Agreement between Takeda and Ranbaxy was to allocate 100% of the market for Actos and its generic

equivalents in the United States to Takeda, delay the sales of generic Actos products, and fix the price at which consumers and other end payors would pay for Actos and its generic equivalents at the higher, branded price.

359.    The Reverse Payment Agreement harmed competition.

360.    As a direct and proximate result of Takeda's and Ranbaxy's unlawful restraint of trade, Plaintiff and members of the Actos Class paid artificially inflated prices for Actos and its generic equivalents as described herein, and were harmed as a result.

361.    By engaging in the foregoing conduct, Takeda and Ranbaxy violated the following state laws:

> a.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade inviolation of Ala. Code § 8-10-3, with respect to purchases of Actos in Alabama by members of the Actos Class.
>
> b.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Arizona Rev. Stat. §§ 44-1401, *et seq.,* with respect to purchases of Actos in Arizona by members of the Actos Class.
>
> c.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Cal. Bus. Code §§ 16700, *et seq*., and Code §§ 17200, *et seq*., with respect to purchases of Actos in California by members of the Actos Class.
>
> d.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of D.C. Code Ann. §§ 28-45031, *et seq*., with respect to purchases of Actos in the District of Columbia by members of the Actos Class.
>
> e.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Fla. Stat. §§ 501. Part II, *et seq*., with respect to purchases of Actos in Florida by members of the Actos Class, and this conduct constitutes a predicate act under the Florida Deceptive Practices Act.

f.  Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Hawaii Code §480, *et seq*., with respect to purchases of Actos in Hawaii by members of the Actos Class.

g.  Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Iowa Code § 553, *et seq*., with respect to purchases of Actos in Iowa by members of the ActosActos Class.

h.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq*., with respect to purchases of Actos in Kansas by members of the Actos Class.

i.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Me. Rev. Stat. Ann. 10, § 1101, *et seq*., with respect to purchases of Actos in Maine by members of the Actos Class.

j.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Mass. Ann. Laws ch. 93, *et seq*., with respect to purchases of Actos in Massachusetts by members of the Actos Class.

k.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.771, *et seq*., with respect to purchases of Actos in Michigan by members of the Actos Class.

l.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Minn. Stat. §§ 325D.52, *et seq*., with respect to purchases of Actos Minnesota by members of the Actos Class.

m.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq*., with respect to purchases of Actos in Mississippi by members of the Actos Class.

n.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Neb. Code Ann. §§ 59-801, *et seq*., with respect to purchases of Actos in Nebraska by members of the Actos Class.

o.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Aim. § 598A, *et seq*., with respect to purchases

of Actos in Nevada by members of the Actos Class, in that thousands of sales of Actos took place at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct.

p.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, *et seq.,* with respect to purchases of Actos in New Mexico by members of the Actos Class.

q.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of New York General Business Law § 340, *et seq.,* with respect to purchases of Actos in New York by members of the Actos Class.

r.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, *et seq.,* with respect to purchases of Actos in North Carolina by members of the Actos Class.

s.  Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of N.D. Cent. Code § 51-08.1-01, *et seq.,* with respect to purchases of Actos in North Dakota by members of the Actos Class.

t.  Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of 10 L.P.R.A. § 258 with respect to purchases of Actos in Puerto Rico by members of the Actos Class.

u.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of R.I. Gen. Laws §§ 6-36-5, *et seq.* with respect to purchases of Actos in Rhode Island by members of the Actos Class.

v.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of S.D. Codified Laws Ann. § 37-1, *et seq.,* with respect to purchases of Actos in South Dakota by members of the Actos Class.

w.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.,* with respect to purchases of Actos in Tennessee by members of the Actos Class, in

that the actions and transactions alleged herein substantially affected Tennessee with thousands of end-payors in Tennessee paying substantially higher prices for Actos at Tennessee pharmacies.

x.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Utah Code Ann. §§ 76-10-911, *et seq.,* with respect to purchases of Actos in Utah by residents of Utah who are members of the Actos Class.

y.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Vt. Stat. Ann. 9, § 2453, *et seq.,* with respect to purchases of Actos in Vermont by members of the Actos Class.

z.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of W.Va. Code §§ 47-18-1, *et seq.,* with respect to purchases of Actos in West Virginia by members of the Actos Class.

aa.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Wis. Stat. § 133.01, *et seq.,* with respect to purchases of Actos in Wisconsin by members of the Actos Class, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher price for Actos at Wisconsin pharmacies.

362.     Plaintiff and members of the ACTOS Class have been injured in their business or property by reason of Takeda's and Ranbaxy's antitrust violations, in that Plaintiff and the Actos Class: (i) were denied the opportunity to purchase lower-priced generic Actos; and (ii) paid higher prices for branded Actos than they would have paid in the absence of the unlawful conduct. These injuries are of the type the laws of the above States, the District of Columbia and Puerto Rico were designed to prevent, and flow from that which makes the conduct unlawful.

363.     Plaintiff and the Actos Class seek damages and multiple damages as permitted by law for their injuries.

## EIGHTEENTH CLAIM FOR RELIEF

**Conspiracy and Combination in Restraint of Trade Under State Law**
**(Actos Class Against Takeda and Actavis)**

364. Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

365. The Reverse Payment Agreement between Takeda and Actavis regarding ACTOS involves: (a) a payment from Takeda to Actavis; and (b) an agreement by Actavis to delay marketing its generic ActosActos. The payments from Takeda to Actavis under the Agreement were the *quid pro quo* for Actavis's agreement to delay marketing its generic versions of ActosActos. Absent the payments, Actavis would not have agreed to delay marketing its generic versions of ActosActos and would have entered the market sooner than it did.

366. The purpose and effect of the payments flowing from Takeda to Actavis under the agreement was to delay generic competition to ActosActos and there is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

367. The purpose and effect of the unlawful Reverse Payment Agreement between Takeda and Actavis was to allocate 100% of the market for ActosActos and its generic equivalents in the United States to Takeda, delay the sales of generic ActosActos products, and fix the price at which consumers and other end payors would pay for ActosActos and its generic equivalents at the higher, branded price.

368. The Reverse Payment Agreement harmed competition.

369. As a direct and proximate result of Takeda's and Actavis's unlawful restraint of trade, Plaintiff and members of the ActosActos Class paid artificially inflated prices for ActosActos and its generic equivalents as described herein, and were harmed as a result.

370. By engaging in the foregoing conduct, Takeda and Actavis violated the following state laws:

a. Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Ala. Code § 8-10-3, with respect to purchases of ActosActos in Alabama by members of the ctosActos Class.

b. Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Arizona Rev. Stat. §§ 44-1401, *et seq.,* with respect to purchases of ActosActos in Arizona by members of the ActosActos Class.

c. Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Cal. Bus. Code §§ 16700, *et seq.,* and Code §§ 17200, *et seq.,* with respect to purchases of ActosActos in California by members of the ActosActos Class.

d. Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of D.C. Code Ann. §§ 28-45031, *et seq.,* with respect to purchases of ActosActos in the District of Columbia by members of the ActosActos Class.

e. Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Fla. Stat. §§ 501. Part II, *et seq.,* with respect to purchases of ActosActos in Florida by members of the ActosActos Class, and this conduct constitutes a predicate act under the Florida Deceptive Practices Act.

f. Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Hawaii Code §480, *et seq.,* with respect to purchases of Actos in Hawaii by members of the Actos Class.

g. Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Iowa Code § 553, *et seq.,* with respect to purchases of Actos in Iowa by members of the ActosActos Class.

h. Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq.,* with respect to purchases of ActosActos in Kansas by members of the ActosActos Class.

i.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Me. Rev. Stat. Ann. 10, § 1101, *et seq.,* with respect to purchases of ActosActos in Maine by members of the ActosActos Class.

j.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Mass. Ann. Laws ch. 93, *et seq.,* with respect to purchases of ActosActos in Massachusetts by members of the ActosActos Class.

k.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.771, *et seq.,* with respect to purchases of ActosActos in Michigan by members of the ActosActos Class.

l.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Minn. Stat. §§ 325D.52, *et seq.,* with respect to purchases of ActosActos Minnesota by members of the ActosActos Class.

m.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq.,* with respect to purchases of ActosActos in Mississippi by members of the ActosActos Class.

n.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Neb. Code Ann. §§ 59-801, *et seq.,* with respect to purchases of ActosActos in Nebraska by members of the ActosActos Class.

o.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, *et seq.,* with respect to purchases of ActosActos in Nevada by members of the ActosActos Class, in that thousands of sales of ActosActos took place at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct.

p.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, *et seq.,* with respect to purchases of ActosActos in New Mexico by members of the ActosActos Class.

q.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of New York General Business Law § 340, *et seq.,* with respect to purchases of ActosActos in New York by members of the ActosActos Class.

r.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, *et seq.,* with respect to purchases of ActosActos in North Carolina by members of the ActosActos Class.

s.    Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of N.D. Cent. Code § 51-08.1-01, *et seq.,* with respect to purchases of ActosActos in North Dakota by members of the ActosActos Class.

t.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Or. Rev. Stat. §§ 646.705, *et seq.,* with respect to purchases of ActosActos in Oregon by members of the ActosActos Class.

u.    Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of 10 L.P.R.A. § 258 with respect to purchases of Actos in Puerto Rico by members of the Actos Class.

v.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of R.I. Gen. Laws §§ 6-36-5, *et seq.* with respect to purchases of ActosActos in Rhode Island by members of the ActosActos Class.

w.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of S.D. Codified Laws Ann. § 37-1, *et seq.,* with respect to purchases of ActosActos in South Dakota by members of the ActosActos Class.

x.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.,* with respect to purchases of ActosActos in Tennessee by members of the ActosActos Class, in that the actions and transactions alleged herein substantially affected Tennessee with thousands of end-payors in Tennessee paying substantially higher prices for ActosActos at Tennessee pharmacies.

y.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Utah Code Ann. §§ 76-10-911, *et seq.,* with respect to purchases of ActosActos in Utah by residents of Utah who are members of the ActosActos Class.

z.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Vt. Stat. Ann. 9, § 2453, *et seq.,* with respect to purchases of ActosActos in Vermont by members of the ActosActos Class.

aa.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of W.Va. Code §§ 47-18-1, *et seq.,* with respect to purchases of ActosActos in West Virginia by members of the ActosActos Class.

bb.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Wis. Stat. § 133.01, *et seq.,* with respect to purchases of ActosActos in Wisconsin by members of the ActosActos Class, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher price for ActosActos at Wisconsin pharmacies.

371.    Plaintiff and members of the ActosActos Class have been injured in their business or property by reason of Takeda's and Actavis's antitrust violations, in that Plaintiff and the ActosActos Class: (1) were denied the opportunity to purchase lower-priced generic ActosActos; and (2) paid higher prices for branded ActosActos than they would have paid in the absence of the unlawful conduct. These injuries are of the type the laws of the above States, the District of Columbia and Puerto Rico were designed to prevent, and flow from that which makes the conduct unlawful.

372.    Plaintiff and the ActosActos Class seek damages and multiple damages as permitted by law for their injuries.

## NINETEENTH CLAIM FOR RELIEF

**Conspiracy and Combination in Restraint of Trade Under State Law**
**(Actos class Against Takeda and Teva)**

373.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

374.     The Reverse Payment Agreement between Takeda and Teva involves: (i) a payment from Takeda to Teva; and (ii) an agreement by Teva to delay marketing its generic Actos. The payments from Takeda to Teva under the Agreement were the *quid pro quo* for Teva's agreement to delay marketing its generic versions of Actos. Absent the payments, Teva would not have agreed to delay marketing its generic versions of Actos and would have entered the market sooner than it did.

375.     The purpose and effect of the payments flowing from Takeda to Teva under the agreement was to delay generic competition to Actos and there is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

376.     The purpose and effect of the unlawful Reverse Payment Agreement between Takeda and Teva was to allocate 100% of the market for Actos and its generic equivalents in the United States to Takeda, delay the sales of generic Actos products, and fix the price at which consumers and other end payors would pay for Actos and its generic equivalents at the higher, branded price.

377.     The Reverse Payment Agreement harmed competition.

378.     As a direct and proximate result of Takeda's and Teva's unlawful restraint of trade, Plaintiff and members of the Actos Class paid artificially inflated prices for Actos and its generic equivalents as described herein, and were harmed as a result.

379.     By engaging in the foregoing conduct, Takeda and Teva violated the

following state laws:

a.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Ala. Code § 8-10-3, with respect to purchases of Actos in Alabama by members of the Actos Class.

b.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Arizona Rev. Stat. §§ 44-1401, *et seq.,* with respect to purchases of Actos in Arizona by members of the Actos Class.

c.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Cal. Bus. Code §§ 16700, *et seq.,* and Code §§ 17200, *et seq.,* with respect to purchases of Actos in California by members of the Actos Class.

d.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of D.C. Code Ann. §§ 28-45031, *et seq.,* with respect to purchases of Actos in the District of Columbia by members of the Actos Class.

e.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Fla. Stat. §§ 501. Part II, *et seq.,* with respect to purchases of ACTOS in Florida by members of the Actos Class, and this conduct constitutes a predicate act under the Florida Deceptive Practices Act.

f.      Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Hawaii Code §480, *et seq.,* with respect to purchases of Actos in Hawaii by members of the Actos Class.

g.      Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Iowa Code § 553, *et seq.,* with respect to purchases of Actos in Iowa by members of the Actos Class.

h.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq.,* with respect to purchases of Actos in Kansas by members of the Actos Class.

i.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Me. Rev. Stat. Ann. 10, § 1101, *et seq.,* with respect to purchases of Actos in Maine by members of the Actos Class.

j.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Mass. Ann. Laws ch. 93, *et seq.,* with respect to purchases of Actos in Massachusetts by members of the Actos Class.

k.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.771, *et seq.,* with respect to purchases of Actos in Michigan by members of the Actos Class.

l.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Minn. Stat. §§ 325D.52, *et seq.,* with respect to purchases of Actos Minnesota by members of the Actos Class.

m.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq.,* with respect to purchases of Actos in Mississippi by members of the Actos Class.

n.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Neb. Code Ann. §§ 59-801, *et seq.,* with respect to purchases of Actos in Nebraska by members of the Actos Class.

o.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Arm. § 598A, *et seq.,* with respect to purchases of Actos in Nevada by members of the Actos Class, in that thousands of sales of Actos took place at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct.

p.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, *et seq.,* with respect to purchases of Actos in New Mexico by members of the Actos Class.

q.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation

of New York General Business Law § 340, *et seq.,* with respect to purchases of Actos in New York by members of the ActosClass.

r.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, *et seq.,* with respect to purchases of Actos in North Carolina by members of the Actos Class.

s.  Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of N.D. Cent. Code § 51-08.1-01, *et seq.,* with respect to purchases of Actos in North Dakota by members of the Actos Class.

t.  Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of 10 L.P.R.A. § 258 with respect to purchases of Actos in Puerto Rico by members of the Actos Class.

u.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of R.I. Gen. Laws §§ 6-36-5, *et seq.,* with respect to purchases of Actos in Rhode Island by members of the Actos Class.

v.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of S.D. Codified Laws Ann. § 37-1, *et seq.,* with respect to purchases of Actos in South Dakota by members of the Actos Class.

w.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Tem. Code Ann. §§ 47-25-101, *et seq.,* with respect to purchases of Actos in Tennessee by members of the Actos Class, in that the actions and transactions alleged herein substantially affected Tennessee with thousands of end-payors in Tennessee paying substantially higher prices for Actos at Tennessee pharmacies.

x.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Utah Code Ann. §§ 76-10-911, *et seq.,* with respect to purchases of Actos in Utah by residents of Utah who are members of the Actos Class.

y.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in

violation of Vt. Stat. Ann. 9, § 2453, *et seq.,* with respect to purchases of Actos in Vermont by members of the Actos Class.

z.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of W.Va. Code §§ 47-18-1, *et seq.,* with respect to purchases of Actos in West Virginia by members of the Actos Class.

aa.  Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Wis. Stat. § 133.01, *et seq.,* with respect to purchases of Actos in Wisconsin by members of the Actos Class, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher price for Actos at Wisconsin pharmacies.

380.   Plaintiff and members of the Actos Class have been injured in their business or property by reason of Takeda's and Teva's antitrust violations, in that Plaintiff and the Actos Class: (i) were denied the opportunity to purchase lower-priced generic Actos; and (ii) paid higher prices for branded Actos than they would have paid in the absence of the unlawful conduct. These injuries are of the type the laws of the above States, the District of Columbia and Puerto Rico were designed to prevent, and flow from that which makes the conduct unlawful.

381.   Plaintiff and the Actos Class seek damages and multiple damages as permitted by law for their injuries.

### TWENTIETH CLAIM FOR RELIEF

**Conspiracy and Combination in Restraint of Trade Under State Law**
**(Actos class Against All Defendants)**

382.   Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

383.   Through an overarching anticompetitive scheme, including the Reverse Payment Agreements between Takeda and each of Mylan, Ranbaxy, Actavis, and Teva, all Defendants conspired to block and delay the entry into the market of generic Actos. The purpose

and effect of the conspiracy was to allocate 100% of the market for Actos and its generic equivalents in the United States to Takeda, delay the sale of generic Actos products, and fix the price at which consumers and other end payors would pay for Actos and its generic equivalents at the higher, branded price. Absent the conspiracy, generic versions of Actos would have entered the market sooner than they did.

384.　　　There is and was no legitimate, non-pretextual, procompetitive business justification for the conspiracy that outweighs its harmful effect. Even if there were some such conceivable justification, the unlawful agreement between and among the Defendants were not necessary to achieve such a purpose.

385.　　　Each Defendant committed at least one overt act in furtherance of the conspiracy.

386.　　　The unlawful conspiracy harmed competition.

387.　　　As a direct and proximate result of Defendants' unlawful restraint of trade, Plaintiff and members of the Actos Class paid artificially inflated prices for Actos and its generic equivalents as described herein, and were harmed as a result.

388.　　　By engaging in the foregoing conduct, Defendants violated the following state laws:

　　　　　　a.　　Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Ala. Code § 8-10-3, with respect to purchases of Actos in Alabama by members of the Actos Class.

　　　　　　b.　　Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Arizona Rev. Stat. §§ 44-1401, *et seq.,* with respect to purchases of Actos in Arizona by members of the Actos Class.

　　　　　　c.　　Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Cal. Bus. Code §§ 16700, *et seq.,* and Code §§ 17200, *et seq.,*

with respect to purchases of Actos in California by members of the Actos Class.

d.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of D.C. Code Ann. §§ 28-45031, *et seq.,* with respect to purchases of Actos in the District of Columbia by members of the Actos Class.

e.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Fla. Stat. §§ 501. Part II, *et seq.,* with respect to purchases of Actos in Florida by members of the Actos Class, and this conduct constitutes a predicate act under the Florida Deceptive Practices Act.

f.      Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Hawaii Code §480, *et seq*., with respect to purchases of Actos in Hawaii by members of the Actos Class.

g.      Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Iowa Code § 553, *et seq*., with respect to purchases of Actos in Iowa by members of the ActosActos Class.

h.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq.,* with respect to purchases of Actos in Kansas by members of the Actos Class.

i.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Me. Rev. Stat. Ann. 10, § 1101, *et seq.,* with respect to purchases of Actos in Maine by members of the Actos Class.

j.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Mass. Ann. Laws ch. 93, *et seq.,* with respect to purchases of Actos in Massachusetts by members of the Actos Class.

k.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.771, *et seq.,* with respect to purchases of Actos in Michigan by members of the Actos Class.

l.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Minn. Stat. §§ 325D.52, *et seq.,* with respect to purchases of Actos Minnesota by members of the Actos Class.

m.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq.,* with respect to purchases of Actos in Mississippi by members of the Actos Class.

n.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Neb. Code Ann. §§ 59-801, *et seq.,* with respect to purchases of Actos in Nebraska by members of the Actos Class.

o.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, *et seq.,* with respect to purchases of Actos in Nevada by members of the Actos Class, in that thousands of sales of Actos took place at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct.

p.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, *et seq.,* with respect to purchases of Actos in New Mexico by members of the Actos Class.

q.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of New York General Business Law § 340, *et seq.,* with respect to purchases of Actos in New York by members of the ActosClass.

r.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, *et seq.,* with respect to purchases of Actos in North Carolina by members of the Actos Class.

s.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of N.D. Cent. Code § 51-08.1-01, *et seq.,* with respect to purchases of Actos in North Dakota by members of the Actos Class.

t.   Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation

of 10 L.P.R.A. § 258 with respect to purchases of Actos in Puerto Rico by members of the Actos Class.

u. Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of R.I. Gen. Laws §§ 6-36-5, *et seq.,* with respect to purchases of Actos in Rhode Island by members of the Actos Class.

v. Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of S.D. Codified Laws Ann. § 37-1, *et seq.,* with respect to purchases of Actos in South Dakota by members of the Actos Class.

w. Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.,* with respect to purchases of Actos in Tennessee by members of the Actos Class, in that the actions and transactions alleged herein substantially affected Tennessee with thousands of end-payors in Tennessee paying substantially higher prices for Actos at Tennessee pharmacies.

x. Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Utah Code Ann. §§ 76-10-911, *et seq.,* with respect to purchases of Actos in Utah by residents of Utah who are members of the Actos Class.

y. Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Vt. Stat. Ann. 9, § 2453, *et seq.,* with respect to purchases of Actos in Vermont by members of the Actos Class.

z. Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of W.Va. Code §§ 47-18-1, *et seq.,* with respect to purchases of Actos in West Virginia by members of the Actos Class.

aa. Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Wis. Stat. § 133.01, *et seq.,* with respect to purchases of Actos in Wisconsin by members of the Actos Class, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin

paying substantially higher price for Actos at Wisconsin pharmacies.

389.    Plaintiff and members of the Actos Class have been injured in their business or property by reason of Defendants' antitrust violations, in that Plaintiff and the Actos Class: (1) were denied the opportunity to purchase lower-priced generic Actos; and (2) paid higher prices for branded ActosActos than they would have paid in the absence of the unlawful conduct. These injuries are of the type the laws of the above States, the District of Columbia and Puerto Rico were designed to prevent, and flow from that which makes the conduct unlawful.

390.    Plaintiff and the Actos Class seek damages and multiple damages as permitted by law for their injuries.

## TWENTY-FIRST CLAIM FOR RELIEF

### Conspiracy and Combination in Restraint of Trade Under State Law
### (Actoplus met Class Against Takeda and Mylan)

391.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

392.    The Reverse Payment Agreement between Takeda and Mylan regarding Actoplus met involves: (i) a payment from Takeda to Mylan; and (ii) an agreement by Mylan to delay marketing its generic Actoplus met. The payments from Takeda to Mylan under the Agreement were the *quid pro quo* for Mylan's agreement to delay marketing its generic versions of Actoplus met. Absent the payments, Mylan would not have agreed to delay marketing its generic versions of Actoplus met and would have entered the market sooner than it did.

393.    The purpose and effect of the payments flowing from Takeda to Mylan under the agreement was to delay generic competition to Actoplus met and there is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs

their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

394.    The purpose and effect of the unlawful Reverse Payment Agreement between Takeda and Mylan was to allocate 100% of the market for Actoplus met and its generic equivalents in the United States to Takeda, delay the sale of generic Actoplus met products, and fix the price at which consumers and other end payors would pay for Actoplus met and its generic equivalents at the higher, branded price.

395.    The Reverse Payment Agreement harmed competition.

396.    As a direct and proximate result of Takeda's and Mylan's unlawful restraint of trade, Plaintiff and members of the Actoplus met Class paid artificially inflated prices for Actoplus met and its generic equivalents as described herein, and were harmed as a result.

397.    By engaging in the foregoing conduct, Takeda and Mylan violated the following state laws:

> a.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Ala. Code § 8-10-3, with respect to purchases of Actoplus met in Alabama by members of the Actoplus met Class.
>
> b.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Arizona Rev. Stat. §§ 44-1401, *et seq.,* with respect to purchases of Actoplus met in Arizona by members of the Actoplus met Class.
>
> c.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Cal. Bus. Code §§ 16700, *et seq.,* and Code §§ 17200, *et seq.,* with respect to purchases of Actoplus met in California by members of the Actoplus met Class.
>
> d.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of D.C. Code Ann. §§ 28-45031, *et seq.,* with respect to

purchases of Actoplus met in the District of Columbia by members of the Actoplus met Class.

e.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Fla. Stat. §§ 501. Part II, *et seq.,* with respect to purchases of Actoplus met in Florida by members of the Actoplus met Class, and this conduct constitutes a predicate act under the Florida Deceptive Practices Act.

f.      Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Hawaii Code §480, *et seq*., with respect to purchases of plusActoplus met in Hawaii by members of the plusActoplus met Class.

g.      Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Iowa Code § 553, *et seq*., with respect to purchases of plusActoplus met in Iowa by members of the ActoplusActoplus met Class.

h.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq.,* with respect to purchases of Actoplus met in Kansas by members of the Actoplus met Class.

i.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Me. Rev. Stat. Ann. 10, § 1101, *et seq.,* with respect to purchases of Actoplus met in Maine by members of the Actoplus met Class.

j.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Mass. Ann. Laws ch. 93, *et seq.,* with respect to purchases of Actoplus met in Massachusetts by members of the Actoplus met Class.

k.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.771, *et seq.,* with respect to purchases of Actoplus met in Michigan by members of the Actoplus met Class.

l.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in

violation of Minn. Stat. §§ 325D.52, *et seq.,* with respect to purchases of Actoplus met Minnesota by members of the Actoplus met Class.

m.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq.,* with respect to purchases of Actoplus met in Mississippi by members of the Actoplus met Class.

n.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Neb. Code Ann. §§ 59-801, *et seq.,* with respect to purchases of Actoplus met in Nebraska by members of the Actoplus met Class.

o.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, *et seq.,* with respect to purchases of Actoplus met in Nevada by members of the Actoplus met Class, in that thousands of sales of ActoplusActoplus met took place at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct.

p.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, *et seq.,* with respect to purchases of Actoplus met in New Mexico by members of the Actoplus met Class.

q.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of New York General Business Law § 340, *et seq.,* with respect to purchases of Actoplus met in New York by members of the Actoplus met Class.

r.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, *et seq.,* with respect to purchases of Actoplus met in North Carolina by members of the ActoplusActoplus met Class.

s.    Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of N.D. Cent. Code § 51-08.1-01, *et seq.,* with respect to purchases of Actoplus met in North Dakota by members of the Actoplus met Class.

t.    Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of 10 L.P.R.A. § 258 with respect to purchases of Actoplus metActoplus met in Puerto Rico by members of the plusActoplus met Class.

u.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of R.I. Gen. Laws §§ 6-36-5, *et seq.,* with respect to purchases of Actoplus met in Rhode Island by members of the Actoplus met Class.

v.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of S.D. Codified Laws Ann. § 37-1, *et seq.,* with respect to purchases of Actoplus met in South Dakota by members of the Actoplus met Class.

w.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.,* with respect to purchases of Actoplus met in Tennessee by members of the Actoplus met Class, in that the actions and transactions alleged herein substantially affected Tennessee with thousands of end-payors in Tennessee paying substantially higher prices for Actoplus met at Tennessee pharmacies.

x.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Utah Code Ann. §§ 76-10-911, *et seq.,* with respect to purchases of Actoplus met in Utah by residents of Utah who are members of the Actoplus met Class.

y.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Vt. Stat. Ann. 9, § 2453, *et seq.,* with respect to purchases of Actoplus met in Vermont by members of the Actoplus met Class.

z.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of W.Va. Code §§ 47-18-1, *et seq.,* with respect to purchases of Actoplus met in West Virginia by members of the Actoplus met Class.

aa.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Wis. Stat. § 133.01, *et seq.,* with respect to purchases of

Actoplus met in Wisconsin by members of the Actoplus met Class, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher price for Actoplus met at Wisconsin pharmacies.

398.        Plaintiff and members of the Actoplus met Class have been injured in their business or property by reason of Takeda's and Mylan's antitrust violations, in that Plaintiff and the Actoplus met Class: () were denied the opportunity to purchase lower-priced generic Actoplus met; and (2) paid higher prices for branded Actoplus met than they would have paid in the absence of the unlawful conduct. These injuries are of the type the laws of the above States, the District of Columbia and Puerto Rico were designed to prevent, and flow from that which makes the conduct unlawful.

399.        Plaintiff and the Actoplus met Class seek damages and multiple damages as permitted by law for their injuries.

### TWENTY-SECOND CLAIM FOR RELIEF

**Conspiracy and Combination in Restraint of Trade Under State Law**
**(Actoplus met Class Against Takeda and Teva)**

400.        Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

401.        The Reverse Payment Agreement between Takeda and Teva regarding Actoplus met involves: (i) a payment from Takeda to Teva; and (ii) an agreement by Teva to delay marketing its generic Actoplus met. The payments from Takeda to Teva under the Agreement were the *quid pro quo* for Teva's agreement to delay marketing its generic versions of Actoplus met. Absent the payments, Teva would not have agreed to delay marketing its generic versions of Actoplus met and would have entered the market sooner than it did.

402.     The purpose and effect of the payments flowing from Takeda to Teva under the agreement was to delay generic competition to Actoplus met and there is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs

403.     their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

404.     The purpose and effect of the unlawful Reverse Payment Agreement between Takeda and Teva was to allocate 100% of the market for Actoplus met and its generic equivalents in the United States to Takeda, delay the sale of generic Actoplus met products, and fix the price at which consumers and other end payors would pay for Actoplus met and its generic equivalents at the higher, branded price.

405.     The Reverse Payment Agreement harmed competition.

406.     As a direct and proximate result of Takeda's and Teva's unlawful restraint of trade, Plaintiff and members of the Actoplus met Class paid artificially inflated prices for Actoplus met and its generic equivalents as described herein, and were harmed as a result.

407.     By engaging in the foregoing conduct, Takeda and Teva violated the following state laws:

a.     Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Ala. Code § 8-10-3, with respect to purchases of Actoplus met in Alabama by members of the Actoplus met Class.

b.     Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Arizona Rev. Stat. §§ 44-1401, *et seq.,* with respect to purchases of Actoplus met in Arizona by members of the Actoplus met Class.

c.     Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Cal. Bus. Code §§ 16700, *et seq.,* and Code §§ 17200, *et seq.,* with respect to purchases of Actoplus met in California by members of the Actoplus met Class.

d. Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of D.C. Code Ann. §§ 28-45031, *et seq.,* with respect to purchases of Actoplus met in the District of Columbia by members of the Actoplus met Class.

e. Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Fla. Stat. §§ 501. Part II, *et seq.,* with respect to purchases of Actoplus met in Florida by members of the Actoplus met Class, and this conduct constitutes a predicate act under the Florida Deceptive Practices Act.

f. Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Hawaii Code §480, *et seq.*, with respect to purchases of ActoplusActoplus met in Hawaii by members of the ActoplusActoplus met Class.

g. Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Iowa Code § 553, *et seq.*, with respect to purchases of plusActoplus met in Iowa by members of the ActoplusActoplus met Class.

h. Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq.,* with respect to purchases of Actoplus met in Kansas by members of the Actoplus met Class.

i. Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Me. Rev. Stat. Ann. 10, § 1101, *et seq.,* with respect to purchases of Actoplus met in Maine by members of the Actoplus met Class.

j. Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Mass. Ann. Laws ch. 93, *et seq.,* with respect to purchases of Actoplus met in Massachusetts by members of the Actoplus met Class.

k. Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.771, *et seq.,* with respect to

purchases of Actoplus met in Michigan by members of the Actoplus met Class.

l.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Minn. Stat. §§ 325D.52, *et seq.,* with respect to purchases of Actoplus met Minnesota by members of the Actoplus met Class.

m.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq.,* with respect to purchases of Actoplus met in Mississippi by members of the Actoplus met Class.

1.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Neb. Code Ann. §§ 59-801, *et seq.,* with respect to purchases of Actoplus met in Nebraska by members of the Actoplus met Class.

n.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, *et seq.,* with respect to purchases of Actoplus met in Nevada by members of the Actoplus met Class, in that thousands of sales of ActoplusActoplus met took place at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct.

o.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, *et seq.,* with respect to purchases of Actoplus met in New Mexico by members of the Actoplus met Class.

p.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of New York General Business Law § 340, *et seq.,* with respect to purchases of Actoplus met in New York by members of the Actoplus met Class.

q.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, *et seq.,* with respect to purchases of

Actoplus met in North Carolina by members of the Actoplus met Class.

r.    Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of N.D. Cent. Code § 51-08.1-01, *et seq.,* with respect to purchases of Actoplus met in North Dakota by members of the Actoplus met Class.

s.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Or. Rev. Stat. §§ 646.705, *et seq.,* with respect to purchases of Actoplus met in Oregon by members of the Actoplus met Class.

t.    Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of 10 L.P.R.A. § 258 with respect to purchases of ActoplusActoplus met in Puerto Rico by members of the plusActoplus met Class.

u.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of R.I. Gen. Laws §§ 6-36-5, *et seq.* with respect to purchases of Actoplus met in Rhode Island by members of the Actop1us met Class.

v.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of S.D. Codified Laws Ann. § 37-1, *et seq.,* with respect to purchases of Actoplus met in South Dakota by members of the Actoplus met Class.

w.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.,* with respect to purchases of Actoplus met in Tennessee by members of the Actoplus met Class, in that the actions and transactions alleged herein substantially affected Tennessee with thousands of end-payors in Tennessee paying substantially higher prices for Actoplus met at Tennessee pharmacies.

x.    Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Utah Code Ann. §§ 76-10-911, *et seq.,* with respect to purchases of Actoplus met in Utah by residents of Utah who are members of the Actoplus met Class.

y.       Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Vt. Stat. Ann. 9, § 2453, *et seq.,* with respect to purchases of Actoplus met in Vermont by members of the Actoplus met Class.

z.       Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of W.Va. Code §§ 47-18-1, *et seq.,* with respect to purchases of Actoplus met in West Virginia by members of the Actoplus met Class.

aa.      Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Wis. Stat. § 133.01, *et seq.,* with respect to purchases of Actoplus met in Wisconsin by members of the Actoplus met Class, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher price for Actoplus met at Wisconsin pharmacies.

408.       Plaintiff and members of the Actoplus met Class have been injured in their business or property by reason of Takeda's and Teva's antitrust violations, in that Plaintiff and the Actoplus met Class: (i) were denied the opportunity to purchase lower-priced generic Actoplus met; and (ii) paid higher prices for branded Actoplus met than they would have paid in the absence of the unlawful conduct. These injuries are of the type the laws of the above States, the District of Columbia and Puerto Rico were designed to prevent, and flow from that which makes the conduct unlawful.

409.       Plaintiff and the Actoplus met Class seek damages and multiple damages as permitted by law for their injuries.

## TWENTY-THIRD CLAIM FOR RELIEF

### Monopolization and Monopolistic Scheme Under State Law
### (Actos Class Against Takeda)

410.       Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

411.     At all relevant times, Takeda possessed substantial market power (*i.e.*, monopoly power) regarding Actos and its generic equivalents. Takeda possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the sale of Actos and its generic equivalents.

412.     Through the overarching anticompetitive scheme, as alleged extensively above,

413.     Takeda willfully maintained its monopoly power regarding Actos and its generic equivalents, using restrictive or exclusionary conduct, rather than with greater business acumen, and injured Plaintiff and the Actos Class. Takeda's exclusionary conduct under this anticompetitive scheme included improperly listing the '584 Patent and '404 Patent in the Orange Book as drug product patents for Actos; entering into the Reverse Payment Agreements with Mylan, Ranbaxy, and Actavis, regarding Actos; intentionally creating a "bottleneck" to prevent later-filing generic manufacturers from entering the market before August 17, 2011; including the "acceleration clauses" in the agreements with Mylan, Ranbaxy, and Actavis with the purpose and effect of deterring Teva from unraveling those anticompetitive agreements; and paying off Teva with the same purpose and effect.

414.     It was Takeda's conscious objective to further its dominance regarding the sale of

415.     ActosActos and its generic equivalents through the overarching anticompetitive scheme.

416.     Takeda's scheme harmed competition as alleged above.

417.     As a direct and proximate result of Takeda's illegal and monopolistic conduct, as alleged, Plaintiff and the Class were injured.

111

418.     By engaging in the foregoing conduct, Takeda has intentionally and wrongfully maintained monopoly power regarding the sale of Actos and its generic equivalents, in violation of the following state laws:

    a.    Arizona Rev. Stat. §§ 44-1403, *et seq.,* with respect to purchases of Actos in Arizona by members of the Actos Class.

    b.    Cal. Bus. & Prof Code §§ 17200, *et seq.,* and California common law with respect to purchases of Actos in California by members of the Actos Class.

    c.    D.C. Code §§ 28-4503, *et seq.,* with respect to purchases of Actos in the District of Columbia by members of the Actos Class.

    d.    Fla. Stat. §§ 501.201, *et seq.,* with respect to purchases of Actos in Florida by members of the Actos Class.

    e.    Hawaii Code §480, *et seq.,* with respect to purchases of Actos in Hawaii by members of the Actos Class.

    f.    740 Ill. Comp. Stat. 10/3, *et seq.,* with respect to purchases of Actos in Illinois by members of the Actos Class.

    g.    Iowa Code §§ 553.5, *et seq.,* with respect to purchases of Actos in Iowa by members of the Actos Class.

    h.    Kansas Stat. Ann. § 50-161 (b), *et seq.,* with respect to purchases of Actos in Kansas by members of the Actos Class.

    i.    Mass. Gen. L. Ch. 93A, *et seq.,* with respect to purchases of Actos in Massachusetts by members of the Actos Class.

    j.    Me. Rev. Stat. Ann. 10, §§ 1102, *et seq.,* with respect to purchases of Actos in Maine by members of the Actos Class.

    k.    Mich. Comp. Laws Ann. §§ 445.773, *et seq.,* with respect to purchases of Actos in Michigan by members of the Actos Class.

    l.    Minn. Stat. §§ 325D.49, *et seq.,* and Minn. Stat. § 8.31, *et seq.,* with respect to purchases of Actos in Minnesota by members of the Actos Class.

    1.    Miss. Code Ann. §§ 75-21-3, *et seq.,* with respect to purchases of Actos in Mississippi by members of the Actos Class.

m.   Mo. Rev. Stat. §§ 416.011, *et seq.,* with respect to purchase in Missouri by members of the Actos Class.

n.   Neb. Code Ann. §§ 59-802, *et seq.,* with respect to purchases of Actos in Nebraska by members of the Actos Class.

o.   Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.,* with respect to purchases of Actos in Nevada by members of the Actos Class.

p.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases of Actos in New Hampshire by members of the Actos Class.

q.   N.M. Stat. Aim. §§ 57-1-2, *et seq.,* with respect to purchases of Actos in New Mexico by members of the Actos Class.

r.   N.Y. Gen. Bus. Law §340 ("The Donnelly Act"), with respect to purchases of Actos in New Mexico by members of the Actos Class

s.   N.C. Gen. Stat. §§ 75-2.1, *et seq.,* with respect to purchases of Actos in North Carolina by members of the Actos Class.

t.   N.D. Cent. Code §§ 51-08.1-03, *et seq.,* with respect to purchases of Actos in North Dakota by members of the Actos Class.

u.   Or. Rev. Stat. §§ 646.705, *et seq.,* with respect to purchases of Actos in Oregon by members of the Actos Class.

v.   10 L.P.R.A. §§ 260, *et seq.,* with respect to purchases of Actos in Puerto Rico by members of the Actos Class.

w.   R.I. Gen. Laws §§ 6-36-5, *et seq.,* with respect to purchases of Actos in Rhode Island by members of the Actos Class.

x.   S.D. Codified Laws §§ 37-1-3.2, *et seq.,* with respect to purchases of Actos in South Dakota by members of the Actos Class.

y.   Tenn. Code Arm §§ 47-25-101, *et seq.,* with respect to purchases of Actos in Tennessee by members of the Actos Class.

z.   Utah code Ann. §§ 76-10-911, *et seq.,* with respect to purchases of Actos in Utah by members of the Actos Class who reside in Utah.

aa.  Vt. Stat. Ann. 9, §§ 2453, *et seq.,* with respect to purchases of Actos in Vermont by members of the Actos Class.

bb.  W.Va. Code §§ 47-18-4, *et seq.,* with respect to purchases of Actos in West Virginia by members of the Actos Class.

cc. Wis. Stat. §§ 133.03, *et seq.,* with respect to purchases of Actos in Wisconsin by members of the Actos Class.

## TWENTY-FOURTH CLAIM FOR RELIEF

### Attempted Monopolization Under State Law
### (ActosActos Class Against Takeda)

419. Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

420. Takeda, through its overarching anticompetitive scheme, specifically intended to maintain monopoly power in the relevant market. It was Takeda's conscious objective to control prices and/or to exclude competition in the relevant market.

421. The natural, intended, and foreseeable consequence of Takeda's overarching anticompetitive scheme was to control prices and exclude competition in the relevant market, to the extent it did not succeed.

422. There was a substantial and real chance, a reasonable likelihood, and/or a probability that Takeda would succeed in and achieve its goal of maintaining monopoly power in the relevant market.

423. As a direct and proximate result of Takeda's illegal and monopolistic conduct, Plaintiff and the Actos Class were harmed as alleged above.

424. By engaging in the foregoing conduct, Takeda intentionally and wrongfully attempted to monopolize the relevant market in violation of the following state laws:

a. Arizona Rev. Stat. §§ 44-1403, *et seq.,* with respect to purchases of Actos in Arizona by members of the Actos Class.

b. Cal. Bus. & Prof Code §§ 17200, *et seq.,* and California common law with respect to purchases of Actos in California by members of the Actos Class.

c. D.C. Code §§ 28-4503, *et seq.,* with respect to purchases of Actos in the District of Columbia by members of the Actos Class.

d. Fla. Stat. §§ 501.201, *et seq.,* with respect to purchases of Actos in Florida by members of the Actos Class.

e. Hawaii Code §480, *et seq.,* with respect to purchases of Actos in Hawaii by members of the Actos Class.

f. 740 Ill. Comp. Stat. 10/3, *et seq.,* with respect to purchases of Actos in Illinois by members of the Actos Class.

g. Iowa Code §§ 553.5 *et seq.,* with respect to purchases of Actos in Iowa by members of the Actos Class.

h. Kansas Stat. Ann. §§ 50-161(b), *et seq.,* with respect to purchases of Actos in Kansas by members of the Actos Class.

i. Me. Rev. Stat. Ann. 10, §§ 1102, *et seq.,* with respect to purchases of Actos in Maine by members of the Actos Class.

j. Mass. Gen. L. Ch. 93A, *et seq*., with respect to purchases of Actos in Massachusetts by members of the Actos Class.

k. Mich. Comp. Laws Ann. §§ 445.773, *et seq.,* with respect to purchases of Actos in Michigan by members of the Actos Class.

l. Minn. Stat. §§ 325D.49, *et seq.,* and Minn. Stat. § 8.31, *et seq*., with respect to purchases of Actos in Minnesota by members of the Actos Class.

1. Miss. Code Ann. §§ 75-21-3, *et seq.,* with respect to purchases of Actos in Mississippi by members of the Actos Class.

m. Mo. Rev. Stat. §§ 416.011, *et seq*., with respect to purchases of Actos in Missouri by members of the Actos Class.

n. Neb. Code Ann. §§ 59-802, *et seq.,* with respect to purchases of Actos in Nebraska by members of the Actos Class.

o. Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.,* with respect to purchases of Actos in Nevada by members of the Actos Class.

p. N.H. Rev. Stat. Ann. §§ 356.11, et *seq.,* with respect to purchases of Actos in New Hampshire by members of the Actos Class.

q. N.M. Stat. Ann. §§ 57-1-2, *et seq.,* with respect to purchases of Actos in New Mexico by members of the Actos Class.

r. N.Y. Gen. Bus. Law §§ 340, *et seq.,* with respect to purchases of Actos in New York by members of the Actos Class.

s.    N.C. Gen. Stat. §§ 75-2.1, *et seq.,* with respect to purchases of Actos in North Carolina by members of the Actos Class.

t.    N.D. Cent. Code §§ 51-08.1-03, *et seq.,* with respect to purchases of Actos in North Dakota by members of the Actos Class.

u.    Or. Rev. Stat. §§ 646.705, *et seq.,* with respect to purchases of Actos in Oregon by members of the Actos Class.

v.    10 L.P.R.A. §§ 251, *et seq.,* with respect to purchases of Actos in Puerto Rico by members of the Actos Class.

w.    R.I. Gen. Laws §§ 6-36-5 *et seq.,* with respect to purchases of Actos in Rhode Island by members of the Actos Class.

x.    S.D. Codified Laws §§ 37-1-3.2, *et seq.,* with respect to purchases of Actos in South Dakota by members of the Actos Class.

y.    Tenn. Code Ann §§ 47-25-101, *et seq.,* with respect to purchases of Actos in Tennessee by members of the Actos Class.

z.    Utah Code Ann. §§ 76-10-911, *et seq.,* with respect to purchases of Actos in Utah by members of the Actos Class who are residents of Utah.

aa.   Vt. Stat. Ann. 9, §§ 2453, *et seq.,* with respect to purchases of Actos in Vermont by members of the Actos Class.

bb.   W.Va. Code §§ 47-18-4, *et seq.,* with respect to purchases of Actos in West Virginia by members of the Actos Class.

cc.   Wis. Stat. §§ 133.03, *et seq.,* with respect to purchases of Actos in Wisconsin by members of the Actos Class.

## TWENTY-FIFTH CLAIM FOR RELIEF

### State Consumer Protection Violations
### (The Actos and Actoplus metmet Class Against all Defendants)

425.    Plaintiff repeats and realleges all preceding paragraphs in this Complaint as if fully set forth herein.

426.    Defendants engaged in unfair, or unconscionable acts or practices in violation of the state consumer protection statutes listed below.

116

427.     There was a gross disparity between the price that Plaintiff and the Class members paid for the brand product and the value received, given that a less expensive substitute generic product should have been available.

428.     As a direct and proximate result of Defendants' unfair or unconscionable acts or practices in violation of the state consumer protection statutes listed below, Plaintiff and Class members were deprived of the opportunity to purchase a less expensive generic version of Actos and Actoplus met and forced to pay higher prices.

429.     By engaging in the foregoing conduct, Defendants have violated the following state consumer protection unfair and deceptive trade practices and consumer fraud laws:

    a.    Defendants have engaged in unfair or unconscionable acts or practices in violation of Alabama Stat. §8-19-1 *et seq*.,

    b.    Defendants have engaged in unfair or unconscionable acts or practices in violation of Ariz. Rev. Stat. §§ 44-1522, *et seq*.

    b.    Defendants have engaged in unfair or unconscionable acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq*.

    c.    Defendants have engaged in unfair or unconscionable acts or practices or made false representations in violation of D.C. Code §§ 28-3901, *et seq*.

    d.    Defendants have engaged in unfair or unconscionable acts or practices in violation of Fla. Stat. §§ 501.201, *et seq*.

    e.    Defendants have engaged in unfair or unconscionable acts or practices in violation of Haw. Rev. Stat. §§ 480, *et seq*.

    f.    Defendants have engaged in unfair or unconscionable acts or practices in violation of Iowa Code section **§** 714.16, *et seq*.

    g.    Defendants have engaged in unfair or unconscionable acts or practices in violation of Idaho Code Ann. §§ 48-601, *et seq*.

    h.    Defendants have engaged in unfair or unconscionable acts or practices in violation of 815 Ill. Comp. Stat. Ann. §§ 505/1, *et seq*.

i.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Kan. Stat. Ann. §§ 50-623, *et seq*.

j.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Me. Rev. Stat. tit. 5 §§ 207, *et seq*.

k.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Mass. Gen. Laws ch. 93A, *et seq*.

l.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Mich. Comp. Laws Ann. §§ 445.901, *et seq*.

m.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Minn. Stat. §§ 8.31, *et seq.*

n.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Mo. Ann. Stat. §§ 407.010, *et seq*.

o.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Mont. Code Ann. §§ 30-14-101, *et seq*.

p.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Neb. Rev. Stat. §§ 59-1601, *et seq*.

q.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Nev. Rev. Stat. §§ 598.0903, *et seq*.

r.      Defendants have engaged in unfair or unconscionable acts or practices in violation of N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq*.

s.      Defendants have engaged in unfair or unconscionable acts or practices in violation of N.M. Stat. Ann. §§ 57-12-1, *et seq*.

t.      Defendants have engaged in unfair or unconscionable acts or practices in violation of N.Y. Gen. Bus. Law §§ 349, *et seq*.

u.      Defendants have engaged in unfair or unconscionable acts or practices in violation of N.C. Gen. Stat. §§ 75-1.1, *et seq*.

v.      Defendants have engaged in unfair or unconscionable acts or practices in violation of N.D. Cent. Code §§ 51-15-01, *et seq*.

w.      Defendants have engaged in unfair or unconscionable acts or practices in violation of R.I. Gen. Laws §§ 6-13.1-1, *et seq*.

x.      Defendants have engaged in unfair or unconscionable acts or practices in violation of S.D. Codified Laws §§ 37-24-1, *et seq*.

y.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Tenn. Code Ann. §§ 47-18-101, *et seq*.

z.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Utah Code Ann. §§ 13-11-1, *et seq*.

aa.     Defendants have engaged in unfair or unconscionable acts or practices in violation of Vt. Stat. Ann. tit. 9 §§ 2451, *et seq*.

bb.     Defendants have engaged in unfair or unconscionable acts or practices in violation of W. Va. Code §§ 46A-6-101, *et seq*.

430.    Plaintiff and the Class have been injured in their business and property by reason of Defendants' unfair or unconscionable acts or practices alleged herein. Their injury consists of paying higher prices for Actos and Actoplus met than they would have paid in the absence of such violations. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

## TWENTY-SIX CLAIM FOR RELIEF

### Unjust Enrichment Regarding ActosActos
### (the Actos Class Against All Defendants)

431.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

432.    Defendants have benefited from splitting the supracompetitive profits on Takeda's Actos sales resulting from the unlawful and inequitable acts alleged in this Complaint.

433.    Defendants' financial benefits resulting from their unlawful and inequitable conduct are traceable to overpayments for Actos by Plaintiff and members of the Actos Class.

434.    Plaintiff and the Actos Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges and supracompetitive profits, to the economic detriment of Plaintiff and the Actos Class.

435.     It would be futile for Plaintiff and the Actos Class to seek a remedy from any party with whom they had privity of contract. Defendants have paid no consideration to anyone for any benefits received indirectly from Plaintiff and the Actos Class.

436.     It would be futile for Plaintiff and the Actos Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it indirectly purchased Actos, as they are not liable and would not compensate Plaintiff or the Actos Class for harm caused by Defendants.

437.     The economic benefit of overcharges and unlawful profits derived by Defendants through charging supracompetitive and artificially inflated prices for Actos is a direct and proximate result of Defendants' unlawful practices.

438.     The financial benefits derived by Defendants rightfully belong to Plaintiff and the Actos Class, because Plaintiff and the Actos Class paid anticompetitive and supracompetitive prices during the Actos Class Period, inuring to the benefit of Defendants.

439.     It would be inequitable under the laws of all states and jurisdictions within the United States, except for Indiana and Ohio, for the Defendants to be permitted to retain any of the overcharges for Actos derived from Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

440.     Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Actos Class all unlawful or inequitable proceeds received by them.

441.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Plaintiff and the Actos Class.

442.     Plaintiff and the Actos Class have no adequate remedy at law.

### TWENTY-SEVENTH CLAIM FOR RELIEF

### Unjust Enrichment Regarding ActopIusActopIus met
### (Actoplus met Class Against Takeda, Mylan, and Teva)

443.　　　　Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

444.　　　　Takeda, Mylan, and Teva have benefited from splitting the supracompetitive profits on Takeda's Actoplus met sales resulting from the unlawful and inequitable acts alleged in this Complaint.

445.　　　　Takeda, Mylan, and Teva's financial benefits resulting from their unlawful and inequitable conduct are traceable to overpayments for Actoplus met by Plaintiff and members of the ActosActos Class.

446.　　　　Plaintiff and the Actoplus met Class have conferred upon Takeda, Mylan, and Teva an economic benefit, in the nature of profits resulting from unlawful overcharges and supracompetitive profits, to the economic detriment of Plaintiff and the Actoplus met Class.

447.　　　　It would be futile for Plaintiff and the Actoplus met Class to seek a remedy from any party with whom they had privity of contract. Takeda, Mylan, and Teva have paid no consideration to anyone for any benefits received indirectly from Plaintiff and the Actoplus met Class.

448.　　　　It would be futile for Plaintiff and the Actoplus met Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it indirectly purchased Actoplus met, as they are not liable and would not compensate Plaintiff or the Actoplus met Class for harm caused by Takeda, Mylan, and Teva.

449.     The economic benefit of overcharges and unlawful profits derived by Takeda, Mylan, and Teva through charging supracompetitive and artificially inflated prices for Actoplus met is a direct and proximate result of Takeda, Mylan, and Teva's unlawful practices.

450.     The financial benefits derived by Takeda, Mylan, and Teva rightfully belong to Plaintiff and the Actoplus met Class, because Plaintiff and the Actoplus met Class paid anticompetitive and supracompetitive prices during the Actoplus met Class Period, inuring to the benefit of Takeda, Mylan, and Teva.

451.     It would be inequitable under the laws of all states and jurisdictions within the United States, except for Indiana and Ohio, for the Takeda, Mylan, and Teva t o be permitted to retain any of the overcharges for Actoplus met derived from Takeda, Mylan, and Teva's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

452.     Takeda, Mylan, and Teva should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Actoplus met Class all unlawful or inequitable proceeds received by them.

453.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Takeda, Mylan, and Teva traceable to Plaintiff and the Actoplus met Class.

454.     Plaintiff and the Actoplus met Class have no adequate remedy at law.

## XIV.  DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff, individually and on behalf of both of the Classes, respectfully prays that:

A.     The Court determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Classes, and declare Plaintiff a representative of the Classes;

B.     The acts alleged herein be adjudged and decreed to be in violation of state antitrust, consumer protection, and unjust enrichment laws of all states and jurisdictions within the United States, except Indiana and Ohio, as alleged herein;

C.     Enter joint and several judgments against Defendants in favor of Plaintiff and the Classes;

D.     Award to Plaintiff and the Classes equitable relief in the nature of disgorgement, restitution, and the creation of a construction trust to remedy Defendants' unjust enrichment;

E.     Award to Plaintiff and the Classes damages and, where applicable, treble, multiple, punitive, and/or other damages, in an amount to be determined at trial, including interest;

F.     Award to Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees as provided by law; and

G.     Grant such other further relief as the Court deems just and proper.

## XV.   JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiff individually and on behalf of the proposed Classes demands a trial by jury on all issues so triable.

Dated:  April 1, 2014

                /s/ Carol V. Gilden
                Carol V. Gilden, Esq.
                COHEN MILSTEIN SELLERS & TOLL, PLLC
                190 South LaSalle Street
                Suite 1705
                Chicago, Illinois
                Tel: (312) 357-0370
                Fax: (312) 357-0369
                cgilden@cohenmilstein.com
                ARDC No.:  6185530

J. Douglas Richards, Esq.
Sharon K. Robertson, Esq.
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street, 14th Floor
New York, New York 10005
Tel: (212) 758-3042
Fax: (212) 838-7745

Frank R. Schirripa, Esq.
Michael A. Rose, Esq.
HACH ROSE SCHIRRIPA & CHEVERIE, LLP
185 Madison Avenue, 14th Floor
New York, New York 10016
Tel: (212) 213-8311
Fax: (212) 779-0028

***Counsel for Plaintiff***